******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BARRY GRAHAM *v.* COMMISSIONER
OF TRANSPORTATION
(AC 37975)

Sheldon, Prescott and West, Js.

*Argued May 23—officially released October 4, 2016*

(Appeal from Superior Court, judicial district of New London, Devine, J. [motions to dismiss; judgment; motion to reargue, set aside judgment]; Cole-Chu, J. [summary judgment motion; judgment; articulation].)

*Ralph J. Monaco*, with whom, on the brief, was *Eric J. Garofano*, for the appellant (plaintiff).

*Lorinda S. Coon*, for the appellee (defendant).

*Opinion*

SHELDON, J. The plaintiff, Barry Graham, appeals from the summary judgment rendered by the trial court in favor of the defendant, the Commissioner of Transportation, in this action to recover damages under the state defective highway statute, General Statutes § 13a-144.[1] The plaintiff commenced this action on July 9, 2012, to recover for injuries he claims to have suffered on December 12, 2011, in a motor vehicle accident allegedly caused by the sliding of the vehicle that he was then operating on untreated black ice in the northbound lanes of Interstate 95 as it crosses the Thames River between New London and Groton on the Gold Star Memorial Bridge. The trial court granted the defendant's motion for summary judgment on the ground that because his statutory duty to keep the bridge in a reasonably safe condition is purely reactive rather than anticipatory, he did not breach that duty to the plaintiff by failing to treat or otherwise remedy the icing condition that caused the plaintiff's accident because he had no actual notice of the specific patch of ice before the accident occurred, and even if he had constructive notice of that ice patch based upon prior reports to the Department of Transportation (department) from the state police about earlier ice related accidents on the bridge that morning, he had insufficient time after receiving such notice to remedy that ice patch before it caused the plaintiff's accident.

On appeal, the plaintiff claims that the trial court erred in rendering summary judgment in favor of the defendant because the evidence before it on the defendant's motion, when considered in the light most favorable to the plaintiff, gave rise to a genuine issue of material fact as to whether the defendant had sufficient time, after receiving actual or constructive notice of the dangerous icing condition that caused his accident, to remedy that condition before the accident occurred.

The defendant opposes this claim in two ways. First, he argues that the trial court ruled correctly, on the undisputed facts before it, that he had insufficient time, after receiving notice of the icing condition that later caused the plaintiff's accident, to remedy that condition before the accident occurred. Second, as an alternative ground for affirming the trial court's ruling, the defendant argues, as he did both in his summary judgment motion and in his prior, unsuccessful motion to dismiss, that the trial court lacked subject matter jurisdiction over this action because the plaintiff's written notice of intent to sue failed to satisfy the requirements of § 13a-144, upon which the state's statutory waiver of its sovereign immunity depends, insofar as the statute required him to disclose the location of his accident and resulting injuries. The plaintiff disputes the defendant's challenge to the legal sufficiency of his written notice of intent to sue insofar as it describes the location of

his accident and resulting injuries.

We agree with the plaintiff that the trial court erred in rendering summary judgment in favor of the defendant because the evidence before it on the defendant's motion gave rise to a genuine issue of material fact as to whether the defendant had sufficient time, after receiving notice of the icing condition that caused the plaintiff's accident, to treat or otherwise remedy that condition before the accident occurred. Therefore, because we also agree with the plaintiff that the adequacy of his written notice of intent to sue to apprise the defendant of the location of his accident and injuries cannot be decided on this record as a matter of law, we reverse the trial court's judgment and remand this case for further proceedings.

The following procedural history is relevant to our disposition of this appeal. In the plaintiff's original complaint dated July 5, 2012, as later revised on May 29, 2014, without substantive alteration as to the issues now before us, he alleged that the defendant has a statutory duty to keep and maintain all highways and bridges within the state highway system in a reasonably safe condition, and that that duty extends to Interstate 95, a public highway in that system. He further alleged that, in the early morning hours of December 12, 2011, employees, representatives and agents of the department became aware that the surface of Interstate 95 on the Gold Star Memorial Bridge had become icy and unreasonably dangerous, based upon reports they had received from the state police of numerous ice related accidents on the bridge that morning. The plaintiff alleged that later that morning, at 6:38 a.m., as he was driving his pickup truck in the northbound lanes of the bridge about one-tenth of one mile south of the New London-Groton town line, it slid on black ice, rolled over on its side and collided with a bridge structure, causing him serious injuries. The plaintiff alleged that the cause of his accident and resulting injuries was the defendant's breach of his statutory duty to keep the bridge in a reasonably safe condition by failing to take adequate measures, in response to the notice he had received of its dangerous condition, either by treating its icy surface, placing or utilizing warning signs in the area to warn travelers of that dangerous condition, or closing the bridge entirely until that dangerous condition could be remedied. Finally, the plaintiff alleged that he had provided timely written notice to the defendant of his intent to sue in connection with his accident and injuries within ninety days of their occurrence, as required by § 13a-144.[2]

On September 12, 2012, the defendant moved to dismiss the plaintiff's original complaint on the ground that the location of the accident specified in the plaintiff's written notice of intent to sue described an area so large that it failed to satisfy the requirements of § 13a-

144, in violation of the sovereign immunity doctrine.[3] This motion was initially granted by the trial court, *Devine*, *J.* Thereafter, however, upon reconsideration of its ruling, the court determined that the language of the plaintiff's written notice was subject to at least one reasonable interpretation that could be found to satisfy the requirements of § 13a-144. Concluding, on that basis, that the adequacy of the plaintiff's written notice to apprise the defendant of the location of his accident and injuries was a disputed issue of fact that should be decided by the finder of fact at trial, the court vacated its initial ruling and denied the defendant's motion to dismiss.[4]

Thereafter, on May 8, 2014, the defendant moved for summary judgment on three grounds: (1) that he did not breach his statutory duty to keep and maintain the bridge in a reasonably safe condition on the morning of the plaintiff's accident because he lacked actual notice of the specific ice patch that caused that accident, and even if he had constructive notice of that ice patch, he lacked sufficient time after receiving such notice to remedy that ice patch before the plaintiff's accident occurred; (2) insofar as the plaintiff's written notice of intent to sue described the location of his accident, it failed to satisfy the requirements of § 13a-144; and (3) that the plaintiff could not prove that the defendant's breach of statutory duty under § 13a-144, if any, was the sole proximate cause of his accident and resulting injuries.

The defendant supported his motion with a memorandum of law and several attached exhibits, including: sworn affidavits from four employees of his department, Peter Silva, James F. Wilson, Jay D'Antonio and Theodore Engel; an excerpt from the certified transcript of the deposition of state police Trooper Robert D. Pierce, who responded to and investigated the plaintiff's accident; and copies of the plaintiff's written notice of intent to sue in connection with his accident, Trooper Pierce's police report concerning the accident, and the department's work log for the day of the accident.

The main thrust of the defendant's argument on the first of his three grounds for seeking summary judgment, to which the trial court ultimately limited its decision on his motion, was that he did not breach his statutory duty to remedy the ice patch that caused the plaintiff's accident and injuries because, although his employees responded promptly to the first report they received of an ice related accident on the bridge that morning, they could not have reached the bridge with the necessary equipment and materials to treat its icy surface and make it reasonably safe for travel before the plaintiff's accident occurred. The department's call log showed, more particularly, that the department first was notified of icing on the bridge at 5:49 a.m. that morning, in a call from the state police to its Bridgeport

operations center, of which Silva was the supervisor. That call reported that an ice related accident had occurred on the bridge at 5:40 a.m. The operations center responded to the call by implementing its standard protocol for responding to off-hour calls for service by calling D'Antonio, the supervisor of the department's maintenance garage in Waterford, which services the Gold Star Memorial Bridge, with instructions to call out a crew to salt the bridge. The Waterford garage, which was then closed, routinely dispatched two man work crews, with one crew leader and one helper, to respond to off-hour calls for service. When crew members were called out to salt an icy bridge or highway, they had to drive in their own nonemergency vehicles to the garage, where the department's deicing equipment and materials were stored, open the garage with the crew leader's key, start and load the salting truck, then drive to the location where salting was to be performed. The garage had two crew leaders in December, 2011: Engel, who lived in Madison, approximately thirty to thirty-five minutes away from the garage when there was no traffic, and another unnamed person whose town of residence was not disclosed. D'Antonio assigned Engel to salt the bridge after the 5:40 a.m. accident was reported to him pursuant to his general practice of alternating off-hour call-outs between crew leaders so as not to "unduly burden" either one of them in the busy winter season.

After being called out at about 5:51 a.m. on December 12, 2011, Engel and his helper, William Grant, needed more than one hour to get to and open the garage, prepare and load a truck for salting operations and drive the truck to the bridge. By the time they reached the bridge, the plaintiff's accident had already occurred, and the state police, who had been on the bridge since before 6 a.m. responding to other accidents, had closed the bridge. On the basis of this evidence, the defendant argued that he could not be held liable for the plaintiff's accident or injuries because he lacked sufficient time after receiving constructive notice of ice on the bridge at 5:49 a.m. to reach and treat the bridge before the plaintiff's accident occurred.

Finally, the defendant presented evidence, through Silva's sworn affidavit, that in addition to attempting to treat the bridge with salt on the morning of the plaintiff's accident, his employees attempted, at 6:23 a.m., to warn motorists approaching the bridge of its dangerous condition by illuminating electronic signboards positioned about one-tenth of one mile before the start of the bridge in both directions, which read: "Slippery Conditions. Use Caution." The plaintiff, he contended, had to drive by one such illuminated signboard when he drove his truck onto the bridge approximately fifteen minutes later.

The plaintiff opposed the defendant's motion for sum-

mary judgment with his own memorandum of law and accompanying exhibits, including: an excerpt from the certified transcript of the deposition of Diana Dean, the driver who had been involved in the first ice related accident reported to the defendant on the morning of the plaintiff's accident; the police report concerning the Dean accident, which was written by state police Trooper Christopher Sottile, who had responded to and investigated that accident before the plaintiff's accident that morning; an excerpt from the certified transcript of the deposition of Engel, the crew leader who had been called out to treat the bridge after the Dean accident; the sworn affidavit of Silva, the supervisor of the department's operations center in Bridgeport, who described the department's standard protocol for responding to off-hour calls and averred that the previously described electronic signboards had been illuminated before the plaintiff's accident; the plaintiff's own sworn affidavit describing his accident and the events leading up to it; another excerpt from the certified transcript of the deposition of Trooper Pierce, as to his investigation of the plaintiff's accident; the police report of Trooper Pierce concerning the plaintiff's accident; and work logs for the Waterford garage on the day of Dean's and the plaintiff's accidents.

The plaintiff relied on these submissions to raise issues of fact as to several aspects of the defendant's initial ground for seeking summary judgment. First, Dean testified and Sottile wrote in his police report that when her accident occurred at 5:40 a.m. on the morning of the plaintiff's accident, the entire surface of the roadway on the northbound side of the bridge was covered with black ice, which caused her vehicle to spin out of control in the right lane of the five lane bridge and continue spinning all the way across the bridge until it crashed into the cement barrier on the opposite side of the roadway. Second, the plaintiff averred in his affidavit and Trooper Pierce confirmed in his police report that when the plaintiff's accident occurred almost one hour after the Dean accident, the entire surface of the roadway on the northbound side of the bridge was still completely covered with black ice. Third, Engel testified, based upon his three years of experience working at the Waterford garage in the winter, that when the outside temperature falls below freezing, the surface of the Gold Star Memorial Bridge, unlike those of other nearby bridges, is prone to freezing over completely, with black ice of the kind he saw on the morning of December 12, 2011, due to the recurring presence of ice fog in the area. The department's work logs confirmed that the air temperature at 6 a.m. on that date was 27 degrees Fahrenheit, and the surface temperature of the roadway was 24 degrees Fahrenheit. Fourth, although Silva averred in his affidavit that electronic signboards warning of slippery conditions on the bridge had been illuminated before the plaintiff drove

onto the bridge on the morning of his accident, both the plaintiff and Engel swore that they had not seen any such warning signs when they drove onto the northbound lanes of the bridge several minutes later. Fifth, shortly after the plaintiff's accident took place, the state police closed the northbound lanes of the bridge entirely until its icy surface could be treated by department personnel.

In light of the foregoing evidence, the plaintiff claimed that the defendant was not entitled to summary judgment on the first ground raised in his motion because the reasonableness of a defendant's response to notice he receives of ice on a bridge or highway is a multifactorial factual issue that must typically be decided by the finder of fact at trial. Here, in particular, the plaintiff claimed that he had presented evidence raising several genuine issues of material fact about factors upon which the ultimate resolution of that issue in this case depends. Those issues included: whether the defendant had actual notice of the dangerous icing condition that caused his accident and injuries based upon the reported observations by the state police of black ice covering the entire northbound surface of the bridge from almost one hour before the plaintiff's accident until the state police responded to it well after it occurred; whether, in light of the magnitude of the danger presented by the pervasive icing condition of which the defendant had notice, as evidenced by the numerous ice related accidents it had caused in subfreezing weather conditions known to cause icing due to ice fog, it was reasonable for the defendant to call out a work crew that predictably could not reach the bridge and treat it until more than one hour after they were first called out; whether, if a work crew called out to treat the bridge could not reasonably be expected to treat it for more than one hour after they were first called out, adequate measures were taken in the interim to warn motorists still using it of its dangerous icing condition before that condition was remedied; and whether, if the bridge could not be treated more quickly and the motoring public could not be warned more effectively of its dangerous condition before it was treated, the bridge should have been closed to all traffic before, not after, the plaintiff's accident. In light of those open, contested issues, the plaintiff insisted that the reasonableness of the defendant's response to the black ice condition reported to the department before the plaintiff's accident presented a genuine issue of material fact that should be decided by the finder of fact at trial.

On January 12, 2015, the trial court, *Cole-Chu, J.*, heard oral argument on the defendant's motion for summary judgment, at which the foregoing arguments were presented. Thereafter, on May 12, 2015, the trial court granted the defendant's motion for summary judgment. In its memorandum of decision, the trial court held that "despite . . . the drawing of inferences in the light

most favorable to the nonmoving party . . . the court concludes that the defendant is entitled to judgment as a matter of law. The court cannot conclude that the defendant had actual notice of the black ice condition which caused the plaintiff's accident before the report of that accident. Even treating the black ice on the bridge in general as the defect which caused the plaintiff's accident and treating the black ice accident on the same bridge fifty minutes before the plaintiff's accident as constructive notice to the defendant of that defect, the court finds as a matter of law that the defendant's response time was reasonable. Indeed, the plaintiff does not contend otherwise, other than by claiming that the defendant should have anticipated the black ice condition."[5] (Citation omitted.) Thereafter, the plaintiff filed this appeal.

I

We begin by noting that our standard of review as to a trial court's decision to grant a motion for summary judgment is plenary. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Bellemare* v. *Wachovia Mortgage Corp.*, 284 Conn. 193, 198, 931 A.2d 916 (2007). "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the non-moving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45]." (Internal quotation marks omitted.) *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 46–47, 881 A.2d 194 (2005).

"To prove a breach of statutory duty under this state's defective highway statutes, the plaintiff must prove by a preponderance of the evidence: (1) that the highway was defective as claimed; (2) that the defendant actually knew of the particular defect or that, in the exercise of its supervision of highways in the city, it should have known of that defect; (3) that the defendant, having actual or constructive knowledge of this defect, failed to remedy it having had a reasonable time, under all the circumstances, to do so; and (4) that the defect must have been the sole proximate cause of the injuries and damages claimed, which means that the plaintiff must prove freedom from contributory negligence." (Footnote omitted; internal quotation marks omitted.) *Ormsby* v. *Frankel*, 255 Conn. 670, 675–76, 768 A.2d 441 (2001). In granting the defendant's motion for summary judgment, the trial court predicated its decision on a finding that the plaintiff could not establish the third element of his cause of action, namely, that the state failed to remedy the icing condition on the bridge after having had a reasonable time to remedy such condition after receiving notice thereof. In addition to this finding, the trial court made a necessary subordinate finding that the defendant had received constructive notice of the defective icing condition, which triggered the defendant's duty to remedy that condition within a reasonable period of time.

On appeal, the plaintiff challenges the propriety of the trial court's conclusion that the defendant responded reasonably, as a matter of law, to the notice he received of the black ice that caused the plaintiff's accident and resulting injuries. Specifically, the plaintiff argues that the trial court erroneously determined that the defendant's response to the icing condition on the bridge was reasonable as a matter of law because, under Connecticut law, the question of whether the defendant reasonably responded to a highway defect of which he had notice is a question of fact that must be decided by the finder of fact at trial. In response, the defendant contends that any issue of fact, including what constitutes a reasonable amount of time in particular circumstances for the defendant to respond to notice he receives of a highway defect, may be resolved by summary judgment when the evidence supports only one fair and reasonable conclusion. The defendant asserts that, on the undisputed facts of this case, the only rational conclusion to be drawn is that he acted reasonably because he had no more than forty-nine minutes to remedy the defect at issue, the department followed its standard protocol in responding to the defect, and under the circumstances then existing, it had insufficient time to reach and treat the bridge before the plaintiff's accident occurred.

We agree with the plaintiff that, as a general matter, Connecticut case law dictates that the question of

whether the defendant reasonably responded to the report of a highway defect is a multifactorial determination that must be made by the finder of fact at trial. See id., 693 (holding that "[t]he response time of the defendant to react to a dangerous condition is a fact-specific determination"). Here, however, even if we accept the defendant's argument that summary judgment may appropriately be rendered in particular circumstances where the only rational conclusion to be drawn from the evidence before the trial court is that the defendant had insufficient time to remedy the complained-of defect after receiving notice of it before it caused the plaintiff's injuries, we conclude that the record before the trial court in this case gave rise to several genuine issues of material fact that precluded the rendering of summary judgment on that ground.

### A

### Reasonableness of Defendant's Response to Notice of Highway Defect is Fact-Specific Determination That Must Typically Be Made By Trier of Fact

Under the state defective highway statute, it is well established that "[t]he state is not an insurer of the safety of travelers on the highways which it has a duty to repair. Thus, it is not bound to make the roads absolutely safe for travel. . . . Rather, the test is whether or not the state has exercised reasonable care to make and keep such roads in a reasonably safe condition for the reasonably prudent traveler." (Internal quotation marks omitted.) *Hall* v. *Burns*, 213 Conn. 446, 462–63, 569 A.2d 10 (1990). The defendant's "statutory obligation under § 13a-144 to keep the highway safe from defects is a reactive obligation, not an anticipatory obligation." *Ormsby* v. *Frankel*, supra, 255 Conn. 676. Thus, "[l]iability imposed on the defendant under § 13a-144 for a defective highway is based on proof of the existence of a defect *and* on the defendant's failure to remedy the defect within a reasonable time after receiving actual or constructive notice of the defect where that defect is the sole proximate cause of a plaintiff's injury." (Emphasis in original; internal quotation marks omitted.) *Hall* v. *Burns*, supra, 462.

Although the present case involves a claim under § 13a-144, our courts have held that the defendant's duty to maintain the safety of state bridges and highways under § 13a-144 mirrors a municipality's duty to maintain the safety of municipal sidewalks, bridges and highways under the parallel provisions of General Statutes § 13a-149. Therefore, our courts frequently have relied on case law under one of those statutes to resolve common issues arising under the other, such as whether the defendant or the municipality owed the plaintiff a duty of care under particular circumstances, whether the defendant received either actual or constructive notice in those circumstances of a defect on a bridge

or highway it had the duty to maintain, and whether the defendant, in responding to such notice, breached the statutory duty of care.[6]

Furthermore, our analysis under the two statutes is often guided by the general principles applicable to negligence actions. While it is well settled that "the liability of the defendant under § 13a-149 is purely for breach of statutory duty and does not arise from negligence . . . [t]his does not mean, however, that negligence principles are wholly inapplicable" to the court's analysis. (Citation omitted; internal quotation marks omitted.) *Prato* v. *New Haven*, 246 Conn. 638, 645, 717 A.2d 1216 (1998); see also *White* v. *Burns*, 213 Conn. 307, 322, 567 A.2d 1195 (1990) ("There can be no question but that the nature of the duty resting upon the state . . . is to exercise reasonable care to keep the state highways in a reasonably safe condition for public travelers whether by pedestrians or vehicles. . . . That duty is that of reasonable care, that is, that degree of care which the ordinarily prudent person would exercise under similar circumstances." [Citation omitted.]). The availability and effectiveness of the state's chosen course of action for remedying a known highway defect will invariably depend on the facts and circumstances presented in each case. For this reason, our courts have insisted that the determination of whether the state acted reasonably must be made by a trier of fact apprised of all of the facts and circumstances of the case.

It is noteworthy that the state defective highway statute, now § 13a-144, has existed in Connecticut for more than 100 years. See *Cloughessey* v. *Waterbury*, 51 Conn. 405 (1884). Despite countless opportunities to do so, our courts have refrained from setting a bright line rule for what constitutes a reasonable response time, by either the state or a municipality, when responding to notice of a defective highway condition. See, e.g., *Hall* v. *Burns*, supra, 213 Conn. 474–75 (holding that "in order for the jury to determine whether the commissioner exercised reasonable care . . . it is only fair that the jury be made aware of all of the circumstances surrounding the commissioner's statutory duty"); *Goldstein* v. *Hartford*, 144 Conn. 739, 740, 131 A.2d 927 (1957) (holding that "[w]hether [the commissioner's] duty has been performed is ordinarily a question of fact"); *Nicefaro* v. *New Haven*, 116 Conn. App. 610, 615–16, 976 A.2d 75 ("What constitutes reasonable care [under the statute] is a fact specific inquiry. . . . For that reason, the circumstances of each case must be examined." [Citation omitted; internal quotation marks omitted.]), cert. denied, 293 Conn. 937, 981 A.2d 1079 (2009).

In *Carl* v. *New Haven*, 93 Conn. 622, 625, 107 A. 502 (1919), our Supreme Court held that, under the municipal defective highway statute, now § 13a-149,

"our municipalities, [with regard to] conditions produced by fallen snow or formed ice upon streets and walks, are under no obligation to make them absolutely safe, and much less to make them safe under all circumstances. What the law requires of them, and all that it requires, is the exercise of such efforts and the employment of such measures—directed to the end that their streets and walks be maintained in a reasonably safe condition, all the circumstances of the situation considered—as, in view of the circumstances and conditions, are in themselves reasonable." The court further stated that "[t]he circumstances to be taken into account, and the considerations to be weighed, in determining what is reasonable to be done, and what is a reasonable condition to be sought after and attained, if reasonably attainable, are many. . . . They involve, as prominent elements in the decision, the location, extent and character of the use made of the street or walk, the practicability and efficiency of possible remedial measures, the size of the problem which the municipality is called upon to face in the existing emergency, the expenditure involved in dealing with that problem in the several possible ways, the physical resources that the municipality has at command which it can utilize to deal with it, and so forth and so forth. *It follows naturally and necessarily from the variety of the elements which may exist in different situations as they arise, that our courts have never undertaken to lay down a rule defining with particularity and precision the duty owed* by our towns, cities and boroughs in their dealings with the manifold problems which, in our climate, are presented by formed ice or fallen snow upon public highways or walks. *They have realized, and frequently expressed, the impossibility of framing one of universal application in other than general language which is elastic in that it embodies the qualification of reasonableness under all the circumstances at every turn of the definition.* The accepted general rule looks constantly to the ever changing circumstances of situations, and its key-note throughout is reasonableness in view of the circumstances as they appear upon each occasion." (Emphasis added.) Id., 625–26.

In the present case, the defendant has repeatedly argued that, because the department followed its standard response protocol in responding to an off-hour call for service after the Dean accident, its response was reasonable as a matter of law. Our case law demonstrates, however, that assessing whether the defendant's response to notice he received of a highway defect was reasonable involves the consideration of many different factors, some of which may be unique to each case. Here, the defendant was required to respond reasonably to notice of a dangerous black ice condition that had caused numerous accidents on the bridge. In responding to notice of a dangerous icing condition on a bridge or highway, the defendant can obviously

consider taking several different courses of action. First, he can attempt to fix the dangerous icing condition by treating the ice or removing it from the bridge's surface, although that might take too much time to alleviate its immediate danger to travelers who are still using the bridge. As a temporary response to a dangerous icing condition that cannot be treated or removed immediately, the defendant can also take steps to warn travelers still using the bridge of its dangerous condition so they can avoid using it or minimize the danger arising from continuing to use it, provided, of course, that the warning is sufficiently prominent and pointed to inform travelers of the true nature and extent of that danger, and thus to induce them to use appropriate caution if they choose to drive upon it. Finally, if warnings of the dangerous condition would not suffice to warn travelers still using the bridge of the danger arising from its use before it is treated, the defendant could require travelers to avoid it altogether by closing the bridge until the dangerous condition is remedied.

The plaintiff is entitled to have the finder of fact assess the reasonableness of the defendant's response to the notice he received of the dangerous icing condition on the bridge on the morning of the plaintiff's accident unless the defendant can prove, based upon the evidence before the trial court on his motion, that there is no genuine issue of material fact that he had insufficient time after receiving such notice to use any of these measures, alone or in combination, to make the bridge reasonably safe for travelers before the plaintiff's accident occurred.

## B

### Genuine Issues of Material Fact that Bore Upon Reasonableness of Defendant's Response to Notice he Received of Icy Condition That Caused Plaintiff's Accident and Injuries

Here, the plaintiff contends that there are genuine issues of material fact as to several factors that could have affected the finder of fact's ultimate determination as to whether the defendant had sufficient time, after receiving notice of the dangerous condition that caused the plaintiff's accident and injuries, to remedy that condition before the accident occurred. We agree, concluding that alone or in combination, these open factual questions should have precluded the trial court from rendering summary judgment in favor of the defendant in this case.

### 1

### Whether and When Defendant Received Actual Notice of Specific Defect That Caused Plaintiff's Accident and Injuries

One critical factor in determining the reasonableness of the defendant's response to any notice he received of a highway defect is how much time he had to respond

to that notice after he first became chargeable with having received it. The trial court agreed with the defendant's claim that he never received actual notice of the specific patch of ice that caused the plaintiff's accident, but at most became chargeable with constructive notice of that ice patch upon receiving earlier reports from the state police about black ice and other ice related accidents on the bridge that morning. By that logic, since the first report by the state police to the defendant's Bridgeport operations center concerning an ice related accident on the bridge that morning did not come in until 5:49 a.m., the defendant could not be charged with having constructive notice of that condition until that time, leaving him at most forty-nine minutes before the plaintiff's accident to remedy that dangerous condition. Although the defendant now accepts both aspects of the trial court's ruling, both as to his own lack of actual notice of the specific ice patch that caused the plaintiff's accident and as to a maximum forty-nine minute time period he had to remedy that ice patch after receiving constructive notice of it, the plaintiff disagrees. He argues, to the contrary, that the record before the trial court gives rise to genuine issues of material fact as to whether the defendant received actual notice of the black ice that caused his injury, and whether he did so as early as 5:40 a.m., when Trooper Sottile was first dispatched to the scene of the Dean accident. There are two basic reasons why we find this claim persuasive.

First, although both the defendant and the trial court have suggested that the plaintiff was injured when his pickup truck slid on an "ice patch" on the morning of his accident, every eyewitness who observed the bridge that morning, both before and after the Dean accident, and before and after the plaintiff's accident, described it as covered with black ice. The latter description, unlike the former, connotes a single, continuous sheet of thin, invisible ice coating the entire roadway, rather than a mottled, irregular surface dotted in isolated places with individual "patches" of ice. So understood, the evidence presented on the defendant's motion gives rise to a genuine issue of material fact as to whether the "specific ice patch" that caused the Dean accident was actually the same specific ice patch that later caused the plaintiff's accident. Testimony from Engel suggested that pervasive icing of the sort that he and the other witnesses observed on the bridge that morning was the very sort of icing that the bridge regularly experienced in subfreezing weather due to ice fog. The department's work records confirmed that both the outside air temperature and the roadway temperature that morning were well below freezing, and thus conducive to the ice fog and the formation of black ice. Finally, considering those facts in a light most favorable to the nonmoving party, both the invisible appearance of the ice on the roadway and the manner in which both Dean

and the plaintiff lost control of their vehicles and spun or slid to the cement barrier on the left side of the roadway were consistent with the presence of a single sheet of black ice covering the northbound lanes of the bridge.

Second, the evidence established that the defendant and the department routinely rely upon the state police to respond to and report to them about highway defects on state roads and bridges. For that reason, our Supreme Court has held that actual notice to the state police of a highway defect constitutes actual notice to the defendant, which occurs when the state police first learn of the defect, not the later time when they report that defect to the defendant or the department. See *Lamb* v. *Burns*, 202 Conn. 158, 173, 520 A.2d 190 (1987). In *Lamb*, the plaintiff brought suit against the defendant under § 13a-144 after she lost control of her car while driving over an ice patch and struck a guard post. Id., 159. At trial, the evidence showed that the state police had received a call about the same ice patch seventy-five minutes before the plaintiff's accident occurred and arrived on scene thirty-five minutes before the accident. Id., 160. Ten minutes after they arrived, the state police called the department. At that time, however, the department's local garage was closed. This, then, was an off-hour call about an icy road condition. Id. In an attempt to warn other motorists of the ice patch, the responding officer lit road flares in the immediate area, but then left the scene to check on another area. After the road flares went out, but before the department's sand truck arrived to treat the ice patch, the plaintiff drove over the ice patch, lost control of her vehicle, and struck the guard post. Id. On appeal, our Supreme Court held that, "[a]lthough the state police are not statutorily charged with duties that concern the repair or maintenance of state highways . . . the evidence in the present case indicates that by custom the commissioner of transportation has availed himself of the assistance of the state police and that the state police have assumed such duties. There was testimony that it is a state trooper's duty and usual procedure to report defects found in the highway. There was further testimony that the [department] relies on the state police to call about highway problems." (Citation omitted; internal quotation marks omitted.) Id., 171. On the basis of this evidence, the court upheld the trial court's instruction that the jury "may consider that notice to [the state police] is notice to the defendant . . . ." (Internal quotation marks omitted.) Id., 173.

Against this background, we conclude that, when the evidence before the trial court is viewed in the light most favorable to the plaintiff, there is a genuine issue of material fact as to whether the pervasive black ice that caused his accident was the same pervasive black ice that caused the Dean accident fifty-eight minutes earlier, and thus as to whether the defendant received

actual notice of that condition as of 5:40 a.m., when Trooper Sottile was first dispatched to respond to the Dean accident, rather than 5:49 a.m. when the state police called the Bridgeport operations center to report the Dean accident to the department.

"In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist." *Nolan* v. *Borkowski*, 206 Conn. 495, 500, 538 A.2d 1031 (1988). The trial court erred in this case in deciding, adversely to the plaintiff, the disputed issues left open by the foregoing evidence as to whether and when the defendant received actual notice of the specific defect that caused the plaintiff's accident and thus became responsible for taking reasonable measures to remedy that defect.

2

Whether Defendant Acted Unreasonably in Responding to Notice of Icing Condition

The plaintiff also argues that the defendant acted unreasonably in responding to initial reports of black ice covering the northbound lanes of the Gold Star Memorial Bridge by calling out a crew leader who lived at least thirty to thirty-five minutes away from the Waterford garage to respond to the dangerous icing condition on the bridge. When viewing the evidence in the light most favorable to the plaintiff, we conclude that there is a genuine issue of material fact as to whether the defendant's decision to dispatch an employee who lived at that distance from the garage was unreasonable under the circumstances, particularly in light of the possible availability of at least one other crew leader and the extreme danger posed to travelers by invisible black ice completely coating a five lane bridge on a major state thoroughfare at the start of the morning commute.

The relevant evidence is as follows. In his motion for summary judgment, the defendant argued that, despite his employees' reasonable efforts to reach the bridge before the plaintiff's accident occurred, it was physically impossible for them to do so because the assigned crew leader, Engel, lived in Madison, thirty to thirty-five minutes away from the garage, without traffic. Engel had been dispatched on this occasion because it was his turn under the alternating call-out system used by garage supervisor, D'Antonio, so as not to unduly burden either crew leader in the busy winter season. No information about the location or potential availability of the other crew leader was presented. In his affidavit, Engel stated that he lives in Madison and that it takes him between thirty to thirty-five minutes of driving, without traffic, to reach the Waterford garage. Engel also stated that, of the two workers responding to the bridge that morning, he was the only one who had

keys to the garage; therefore, even if his coworker had arrived there first, he would have been forced to wait until Engel arrived before accessing the truck and preparing it to treat the icing on the bridge.

During oral argument before this court, the plaintiff argued that it was unreasonable for the defendant to simply say, "well, the guy who is supposed to get all of this going to fix it lives all the way down in Madison, so don't blame us that we couldn't respond within forty-five minutes." We agree. On the basis of the defendant's evidence, we conclude that there was and is a genuine issue of material fact as to whether calling out the other crew leader, if he was then available, would have made it possible to reach and treat the bridge before the plaintiff's accident occurred, thus potentially making the defendant's failure to do so unreasonable under all of the circumstances then existing. There is nothing in the record to show that there was a departmentwide policy of alternating between available crew leaders on off-hour call-outs, and even if there was such a policy, however fair and appropriate it might be to follow it under other circumstances, there would at least have been a genuine issue of material fact as to whether deviating from it would be required under circumstances if it was necessary to do so to ensure that travelers would not be injured by an especially dangerous highway defect.

Although it is certainly possible that Engel lived closer to the Waterford garage than the other crew leader, the moving party on a summary judgment motion bears the heavy burden of removing "any real doubt as to the existence of any genuine issue of material fact." (Internal quotation marks omitted.) *Martel* v. *Metropolitan District Commission*, supra, 275 Conn. 46. The defendant failed to meet that burden with respect to this issue, thus raising a genuine issue of material fact as to whether the defendant, by following its standard practice of alternating between crew leaders for its off-hour call-outs instead of using other, more expeditious options, failed to respond reasonably to the notice it received of the dangerous icing condition on the bridge on the morning of the plaintiff's accident.

3

Whether Defendant Failed to Make Adequate Use
of Available Temporary Remedies to Protect
Travelers While Icy Condition of Bridge
Was Being Remedied

Even if the defendant's employees could not have reached the bridge in time to treat it before the plaintiff's accident occurred, there is still a genuine issue of material fact as to whether the defendant could have responded to the notice he received of its dangerous icy condition in some manner other than physically reaching it and applying deicing materials to it in no

less than fifty-eight minutes. In the present case, the plaintiff argues, the defendant either could have placed or utilized warning signs in the area to warn travelers still using the bridge of its dangerously icy condition or, if no such warnings would be sufficient to warn motorists of its true dangers to the point of inducing them not to drive on the bridge without using appropriate caution, closed the bridge altogether before it was properly treated. We agree with the plaintiff that any decision to use or forgo the use of such temporary measures could have been considered by the finder of fact in assessing whether the defendant acted reasonably in responding to the report of ice on the bridge after the Dean accident.

From the outset of this action, the plaintiff has alleged that the defendant breached his duty under § 13a-144 because, having received notice of the dangerous icing condition on the bridge, he unreasonably failed to warn travelers of that danger.[7] The trial court did not address this argument in its memorandum of decision, instead focusing its entire analysis on the amount of time that was required to reach the bridge with a work crew and apply deicing materials to it. We conclude that there are genuine issues of material fact as to whether the defendant had sufficient time before the plaintiff's accident occurred to respond to the danger posed by the dangerous icing condition on the bridge by warning travelers of it by remotely illuminating its prepositioned electronic signboards with a suitable warning message.

The evidence before the court is as follows. In his deposition, Trooper Pierce testified that there are two electronic signs that are located approximately one-tenth of one mile before the bridge in either direction. Pierce also stated that, although the state police are not notified when the signs are illuminated, he is aware that the department has the ability to activate the signs. The defendant presented evidence that the electronic signboard located before the bridge in the northbound lane of the highway was illuminated at 6:23 a.m. to warn travelers to "use caution" due to "slippery conditions" on the bridge. The defendant's claim in this regard rests entirely on the affidavit of Silva, who so averred, adding that "[the plaintiff] had to have driven past that sign on his way over the bridge."

Notwithstanding such evidence, however, two witnesses who drove over the bridge that morning near the time of the plaintiff's accident did not see the electronic signboard illuminated. First, the plaintiff's affidavit states that he did not see any warning signs that morning. Second, and perhaps more importantly, Engel, the department's crew leader who responded to the bridge approximately ten to fifteen minutes after the plaintiff's accident, stated that he did not see the electronic signboard illuminated when he arrived at the bridge after the plaintiff's accident.

On the basis of Pierce's deposition and Silva's affidavit, it clearly appears that the defendant had the ability to illuminate remotely the electronic signboard to warn travelers of the dangerous condition on the bridge at least fifteen minutes before the plaintiff's accident. The fact that the defendant's employees attempted to do so in that time frame also demonstrates that, in their view at least, taking such a measure to warn travelers of the dangerous condition of the bridge was appropriate in the existing circumstances. The defendant, however, failed to demonstrate the absence of any genuine issue of material fact as to whether the warning sign was actually illuminated that morning, for evidence from two persons that they did not see the sign that morning, including one of the defendant's employees who regularly works on the bridge when it ices over in subfreezing conditions, puts that claim in dispute. Moreover, even if the signboard was illuminated and worded as Silva averred, a genuine issue of material fact might still exist as to whether it was so positioned and worded to give reasonably prudent travelers sufficient warning of a dangerous black ice condition that lay ahead of them.[8] For these additional reasons, we conclude that the trial court should not have granted the defendant's motion for summary judgment on the ground that he had insufficient time after receiving notice of the bridge's dangerous condition to respond to it and remedy that condition.

In addition to warning travelers of the danger caused by black ice on the bridge, the plaintiff also claimed that the defendant could have met his statutory duty of care by closing the bridge before the plaintiff drove over it. Preventing travelers from encountering a defect on the highway is a remedy that the defendant could have utilized, and the record demonstrates that this could have been accomplished in much less time than it took to reach the bridge and treat it with deicing materials. Accordingly, a genuine issue of material fact exists as to whether the defendant acted unreasonably by failing to close the bridge after discovering it was covered in black ice and receiving numerous reports of accidents on it before the plaintiff's accident occurred.

With respect to the conduct of the state police, our courts have held that "[t]he words the legislature employed in § 13a-144 unambiguously support the conclusion that the statute waives sovereign immunity for defective highway claims based upon the neglect or default *not merely of the commissioner of transportation, but of the state or any of its employees*, at least when performing duties related to highway maintenance." (Emphasis added; internal quotation marks omitted.) *Lamb* v. *Burns*, supra, 202 Conn. 169. Furthermore, the court in *Lamb* held that "[t]here are no words in § 13a-144 limiting or restricting the scope of the phrase the state or any of its employees to [department]

employees only." (Internal quotation marks omitted.) Id., 170.

The record thus demonstrates that there is a genuine issue of material fact as to whether the state police responded unreasonably to the icing condition of the bridge by failing to close the road before the plaintiff's accident.[9] In his affidavit, Silva noted that the state police have the authority to close the road if they believe it is in the interest of public safety to do so. As previously discussed, the police report prepared by Trooper Sottile stated that "[t]he entire surface of the bridge was covered with black ice." In support of his motion for summary judgment, the defendant submitted a call log showing that calls were made from the state police to the department at 5:48, 5:49, 5:51, and 6:01 a.m. that morning, all reporting ice related accidents in the northbound lanes of the Gold Star Memorial Bridge. In his affidavit, the plaintiff stated that state police officers arrived at the scene less than five minutes after his accident, and that department workers were on the bridge five or ten minutes after the police arrived. During his deposition, Engel stated that by the time the department's truck reached the bridge, the state police had already closed the northbound lanes of the bridge.

On the basis of the foregoing evidence, there is a genuine issue of material fact as to whether the defendant should have utilized the available alternative remedy of closing the bridge to prevent the plaintiff and others like him from driving on it and encountering the dangerous black ice condition that caused his accident. The plaintiff's affidavit, coupled with Engel's deposition, demonstrates that it takes approximately ten to fifteen minutes to close the northbound lanes of the Gold Star Memorial Bridge, a much shorter time than it took the department to physically respond to the bridge with a work crew and apply deicing materials to it. Therefore, there is a genuine issue of material fact as to whether the failure of the state police to close the bridge before the plaintiff's accident occurred was unreasonable and whether the conduct of the state police can provide a basis for finding the defendant liable under § 13a-144. See *Lamb* v. *Burns*, supra, 202 Conn. 171.

In conclusion, our case law demonstrates that the determination of what constitutes a "reasonable response" by the defendant is a fact-specific determination. The plaintiff was entitled to have a trier of fact consider whether the standard response protocol could have prevented his accident if the department had called other employees to treat the bridge that morning and, in the event that the response time would not thus have been materially reduced, whether the defendant breached his statutory duty by failing to use available temporary remedies to warn travelers of the bridge's dangerous icing condition or prevented them from

encountering that dangerous condition by closing the bridge until it could properly be treated.

On the basis of the foregoing analysis, we conclude that the trial court erred in ruling that the defendant's response to the black ice condition that caused the plaintiff's accident and resulting injuries was reasonable as a matter of law. Several genuine issues of material fact still exist, and these issues must be resolved by the finder of fact at trial.

## II

In the alternative, the defendant claims on appeal that the trial court lacked subject matter jurisdiction over this action because the plaintiff's written notice of intent to sue was patently defective.[10] The defendant argues, therefore, that the plaintiff's claim is barred by the doctrine of sovereign immunity. We disagree.

The following additional procedural history and evidence are relevant to the court's disposition of this alternative claim. After service of process was made upon him, the defendant filed a motion to dismiss the action for lack of subject matter jurisdiction. In support of his motion to dismiss, the defendant submitted the affidavit of Wilson, who stated that the northbound lanes of the Gold Star Memorial Bridge are approximately 5931 feet long and have approximately 500,000 square feet of deck area. The defendant argued that simply identifying the northbound lane of this bridge in the plaintiff's notice was not enough, and that the description provided by the plaintiff was so vague that it prevented the defendant from conducting an intelligent investigation of the plaintiff's claim.[11]

The plaintiff objected to the motion to dismiss, arguing that the notice provision of § 13a-144 does not demand precision and that his description of the northbound side of the Gold Star Memorial Bridge between New London and Groton allowed the defendant to identify the location of the accident and conduct an intelligent investigation. He further argued that the defendant could have relied on additional information within the notice, such as the date and time of the accident, the plaintiff's name and vehicle information, and the description of events provided by the plaintiff. The plaintiff argued, therefore, that the notice was not patently defective and thus that the trial court had subject matter jurisdiction over this action.

On March 21, 2013, the trial court, *Devine, J.*, granted the defendant's motion to dismiss. In doing so, the trial court held that "there [were] no facts set out in the notice that would allow the defendant to determine where on the bridge the alleged defect was located" because the defendant's supporting affidavit demonstrated that the "northbound portion of the bridge is over one mile long consisting of multiple lanes and . . . has more than 500,000 [square] feet of deck area."

On April 1, 2013, the plaintiff moved for reconsideration. In his motion, the plaintiff argued that the notice provided was not patently defective because the phrase, "between New London and Groton, Connecticut," refers to a specific location on the bridge, namely, the boundary line between the two municipalities. Additionally, the plaintiff argued that the defendant had access to several police reports that would have further detailed the location of his accident.

The defendant objected to reconsideration, arguing that the plaintiff's new interpretation of the word "between" was disingenuous because he had not raised this interpretation at any time prior to moving for reconsideration. Additionally, the defendant argued that the words, "between New London and Groton," referred to the location of the bridge itself, not to the location where the plaintiff claimed that the injury occurred. Last, the defendant argued that, because the notice must provide sufficient information on its face, it did not matter whether the defendant could contact police officers to get accident reports.[12]

Upon reconsideration, the trial court, *Devine, J.*, reversed its ruling, holding that "the use of the term 'between' is not patently defective because the term 'between' may refer to the entire Gold Star Memorial Bridge or it may refer to the boundary line of New London and Groton." The trial court held, therefore, that "the adequacy of the notice is a question for the fact finder . . . ."[13] (Citation omitted.)

As mentioned in the preceding paragraphs, the defendant claims that the words, "between New London and Groton, Connecticut," could not reasonably be said to describe the towns' boundary line on the bridge. The defendant further argues that the plaintiff could easily have referenced the town boundary line, but failed to do so. Last, the defendant argues that the plaintiff's description of "Interstate 95 Northbound on the Gold Star Memorial Bridge between New London and Groton, Connecticut," references an area so large that it could not conduct an intelligent investigation and, therefore, the notice was patently defective. We disagree and conclude that the word "between" precludes this court from concluding that the notice was patently defective as a matter of law. Accordingly, we reject the defendant's alternative ground for affirmance.

Before addressing the defendant's argument, we note that our standard of review is plenary. Questions as to whether the doctrine of sovereign immunity bars a claim necessarily implicate the court's subject matter jurisdiction. See *Filippi* v. *Sullivan*, 273 Conn. 1, 8, 866 A.2d 599 (2005). "This court has often stated that the question of subject matter jurisdiction, because it addresses the basic competency of the court, can be raised by any of the parties, or by the court sua sponte,

at any time. . . . [T]he court has a duty to dismiss, even on its own initiative, any appeal that it lacks jurisdiction to hear. . . . Moreover, [t]he parties cannot confer subject matter jurisdiction on the court, either by waiver or by consent." (Citations omitted; internal quotation marks omitted.) *Webster Bank* v. *Zak*, 259 Conn. 766, 774, 792 A.2d 66 (2002); see also *Kozlowski* v. *Commissioner of Transportation*, 274 Conn. 497, 502, 876 A.2d 1148 (2005) (same). "[W]hether subject matter jurisdiction exists is a question of law, and our review of the court's resolution of that question is plenary. . . . Likewise, whether the plaintiff's notice was patently defective and, thus, failed to meet statutory requirements also is a question of law requiring our plenary review." (Citation omitted; internal quotation marks omitted.) *Tyson* v. *Sullivan*, 77 Conn. App. 597, 601, 824 A.2d 857, cert. denied, 265 Conn. 906, 831 A.2d 254 (2003); see also *Filippi* v. *Sullivan*, supra, 8 ("A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss will be de novo." [Internal quotation marks omitted.]).

"It is well established law that the state is immune from suit unless it consents to be sued by appropriate legislation waiving sovereign immunity . . . . Section 13a-144 creates a legislative exception to this common law rule and therefore must be strictly construed. . . . The statutorily required notice is a condition precedent to maintaining a cause of action, and if this requirement is not met, no cause of action exists." (Citations omitted; internal quotation marks omitted.) *Bresnan* v. *Frankel*, 224 Conn. 23, 25–26, 615 A.2d 1040 (1992); see also *Warkentin* v. *Burns*, 223 Conn. 14, 17–18, 610 A.2d 1287 (1992). "The notice requirement is not intended merely to alert the commissioner to the occurrence of an accident and resulting injury, but rather to permit the commissioner to gather information to protect [the state] in the event of a lawsuit." (Internal quotation marks omitted.) *Lussier* v. *Dept. of Transportation*, 228 Conn. 343, 354, 636 A.2d 808 (1994). At the same time, however, "[t]he requirement as to notice was not devised as a means of placing difficulties in the path of an injured person." (Internal quotation marks omitted.) Id.; see also *Filippi* v. *Sullivan*, supra, 273 Conn. 9 (same); *Bresnan* v. *Frankel*, supra, 29 (same). As such, "[t]he plaintiff is not required to be a cartographer" in order to satisfy the requirements of § 13a-144. *Lussier* v. *Dept. of Transportation*, supra, 358. Rather, the plaintiff must provide "sufficient information as to the injury and the cause thereof and the time and place of its occurrence to permit the commissioner to gather information about the case intelligently." (Internal quotation marks omitted.) *Serrano* v. *Burns*, 70 Conn. App. 21, 25, 796 A.2d 1258, cert. denied, 261 Conn. 932, 806 A.2d 1066 (2002).

"Unless a notice, in describing the place or cause of an injury, patently meets or fails to meet this test, the question of its adequacy is one for the jury and not for the court, and the cases make clear that this question must be determined on the basis of the facts of the particular case." *Morico* v. *Cox*, 134 Conn. 218, 223, 56 A.2d 522 (1947). "[T]here are two categories of cases in which the written notice is patently defective because of a problem with the description of the place of injury. The first category consists of situations [in which] a court has found that the notice stated a location different from the [actual] place of . . . injury. . . . The second category consists of situations [in which] the description is so vague in its breadth that the [commissioner] could not be reasonably expected to make a timely investigation based on the information provided." (Citations omitted; internal quotation marks omitted.) *Filippi* v. *Sullivan*, supra, 273 Conn. 10 n.6.

In the present case, the defendant claims that the plaintiff's notice falls within the second category of patently defective notices. The notice supplied by the plaintiff on December 28, 2011, described the location of injury as on the northbound lane of the Gold Star Memorial Bridge "between New London and Groton . . . ." The notice also states that the injury occurred when the plaintiff's "vehicle slid into the cement barricade separating the north and southbound lanes . . . ." On this description alone, we disagree with the defendant that this accident could have happened "anywhere on the more than one mile long bridge." Rather, even considering the language of the notice is its broadest terms, the location of the injury was on the left side of the bridge along the cement barricade separating the north and southbound lanes. Therefore, the area in question is statistically smaller than the 500,000 square feet stated by Wilson in his affidavit. Even so, the leftmost lane of Interstate 95 northbound on the Gold Star Memorial Bridge measures more than one mile in length. If the plaintiff's notice only stated that the accident occurred "on the northbound lane of the bridge along the cement barricade separating the north and southbound lanes," the defendant's argument would be more persuasive. The plaintiff, however, did not describe it in this manner; instead, the plaintiff described the location of injury as "Northbound on the Gold Star Memorial Bridge between New London and Groton, Connecticut."

The trial court, *Devine, J.*, correctly determined that the word "between" has several definitions that, when applied to the facts of this case, could produce very different results. Definitions of the word "between" include, inter alia: "an intermediate position in relation to two other objects . . . in the interval . . . in the space that separates." Webster's Third New International Dictionary (2002). Applying these definitions to

the phrase, "[n]orthbound on the Gold Star Memorial Bridge between New London and Groton, Connecticut," the notice could reasonably be interpreted as referencing the leftmost side of the northbound lane at the point where the towns meet, i.e., the town line. Therefore, an alternate—but equally reasonable—interpretation of the notice would place the location of injury at a specific side and at a specific point in the northbound lanes of the bridge. This description would satisfy the purpose of the notice requirement and would not be patently defective. See *Serrano* v. *Burns*, supra, 70 Conn. App. 28 ("[T]he defendant has offered no proof that the 'rear lot' of a particular rest stop encompasses such an expansive area that it fails to guide him in making an intelligent inquiry into the case. Given the record before us, the defendant is not being asked to range over a six mile stretch of roadway or check a score of manhole covers or several rest areas to try to locate where it was that the plaintiff fell and was injured."); see also *Lussier* v. *Dept. of Transportation*, supra, 228 Conn. 357 ("The notice involved herein did not patently . . . [fail] to meet this test. . . . The road in question is only three-tenths of one mile long. The notice recites that the car landed in the Shunock River and that the river crosses under route 617 at only one place." [Citation omitted; internal quotation marks omitted.]).

Still, the defendant argues that the only reasonable interpretation of the phrase, "between New London and Groton," is that the plaintiff was trying to describe the bridge itself. This argument, however, begs the question: if the plaintiff was trying to describe the location of the bridge itself, why not simply state, "Northbound on the Gold Star Memorial Bridge?" We are mindful that the plaintiff could have referenced the town boundary in his notice and, had he done so, he would have provided the defendant with a more precise location. The requirements of § 13a-144, however, do not demand such precise language from the plaintiff. See *Lussier* v. *Dept. of Transportation*, supra, 228 Conn. 358. Rather, what is required of the plaintiff is sufficient information to allow the defendant to conduct an intelligent investigation of his highway defect claim. *Serrano* v. *Burns*, supra, 70 Conn. App. 25–26; *Tedesco* v. *Dept. of Transportation*, 36 Conn. App. 211, 214, 650 A.2d 579 (1994). Due to the inconsistent results of applying different— yet reasonable—interpretations to the words, "between New London and Groton, Connecticut," this court cannot rule as a matter of law that the plaintiff's written notice of intent to sue was patently defective. As such, the question of adequacy is reserved for the trier of fact.

The judgment is reversed and the case is remanded with direction to deny the defendant's motion for summary judgment and for further proceedings consistent with this opinion.

In this opinion the other judges concurred.

[1] General Statutes § 13a-144 provides in relevant part: "Any person injured

in person or property through the neglect or default of the state or any of its employees by means of any defective highway, bridge or sidewalk which it is the duty of the Commissioner of Transportation to keep in repair . . . may bring a civil action to recover damages . . . . No such action shall be brought . . . unless notice of such injury and a general description of the same and of the cause thereof and of the time and place of its occurrence has been given in writing within ninety days thereafter to the commissioner. . . ."

[2] The plaintiff's notice, which was attached to his original complaint, provides:

| | |
|---|---|
| DATE AND TIME OF INJURY | December 12, 2011 at approximately 6:28 a.m. |
| LOCATION OF INJURY | Interstate 95 Northbound on the Gold Star Memorial Bridge between New London and Groton, Connecticut |
| DESCRIPTION OF EVENT | On December 12, 2011, Mr. Graham was traveling northbound on Interstate 95 in his Ford Ranger pick-up truck across the Gold Star Memorial Bridge between New London and Groton, Connecticut. This bridge is known to the Department of Transportation, State Police, and other State personnel to become icy if the temperature is below freezing when the bridge has any moisture on it. As Mr. Graham traveled over the said bridge at a reasonable rate of speed below the speed limit, his vehicle slid into the cement barricade separating the north and southbound lanes, and then flipped over causing injury and harm to him. As a direct and proximate result of the negligence and carelessness of the State by failing to treat the bridge with de-icing substances and other methods of creating a safe travel condition, Mr. Graham was seriously injured. |
| DESCRIPTION OF INJURY | As a direct and proximate result of the aforementioned accident, Mr. Graham sustained a concussion, post-concussive syndrome, right arm injury, right shoulder injury, neck injury, numbness in right arm, and loss of false teeth. |

[3] See part II of this opinion.

[4] Subsequent to the trial court's ruling, the defendant moved for reconsideration, which was denied by the court. The defendant did not file an interlocutory appeal from the trial court's denial of his motion to dismiss.

[5] On October 14, 2015, the plaintiff filed a motion for articulation, asserting that he never conceded that fifty minutes was a reasonable response time. Two weeks later, the trial court, *Cole-Chu, J.*, issued a memorandum stating that regardless of any such concession, the court would have ruled the same way on the defendant's motion based upon the evidence before it.

[6] "In interpreting [the terms of § 13a-144] we have on many occasions looked to and applied the rationale in cases involving statutory actions against municipalities under what is now General Statutes § 13a-149 since there is no material difference in the obligation imposed on the state by § 13a-144 and that imposed on municipalities by § 13a-149 . . . and cases cited." (Citation omitted.) *Donnelly* v. *Ives*, 159 Conn. 163, 167, 268 A.2d 406 (1970). "Because [t]here is no substantial difference in the duties imposed by those statutes . . . we treat them as identical . . . ." (Citation omitted; internal quotation marks omitted.) *McIntosh* v. *Sullivan*, 274 Conn. 262, 266 n.4, 875 A.2d 459 (2005).

[7] In his reply memorandum on motion for summary judgment, the defendant argued that the plaintiff's allegation that the defendant breached his statutory duty by failing "to place or utilize warning signs in the area to warn approaching travelers of the existing hazardous and dangerous condition" was not an actionable defect under Connecticut law. The present case, however, is distinguishable from the cases cited by the defendant. *Stotler* v. *Dept. of Transportation*, 313 Conn. 158, 168–75, 96 A.3d 527 (2014). In *Stotler*, the plaintiff alleged that the lack of adequate warning signs coupled

with the steep grade of the road rendered the road defective. Id., 169–70. In the present case, the plaintiff is not alleging that the lack of warning signs is a defect. Instead, the allegations in the complaint are fairly interpreted to mean that the failure to use available warning signs rendered the defendant's response unreasonable under the circumstances.

[8] Several factors could be considered by a jury when assessing the adequacy of the electronic sign in question, such as the physical dimensions of the sign, how prominently it is displayed along the highway, and whether it has a standard message or whether such message can be tailored to address specific dangerous conditions.

[9] The facts of *Lamb* are analogous to the facts in this case in all but one respect. In *Lamb*, the evidence at trial proved that the officer who responded to an earlier accident used flares to warn travelers of the ice that ultimately caused the plaintiff's accident. *Lamb* v. *Burns*, supra, 202 Conn. 160. At this stage of the present case, there is no evidence that the state police used road flares on the Gold Star Memorial Bridge prior to the plaintiff's accident. Nonetheless, the *Lamb* court suggests that a jury may consider the conduct of the state police when assessing the reasonableness of the state's conduct in responding to reports of defective conditions.

[10] The location of injury provided by the plaintiff stated that the accident occurred on "Interstate 95 Northbound on the Gold Star Memorial Bridge between New London and Groton, Connecticut." See footnote 2 of this opinion.

[11] The gravamen of the defendant's argument throughout these proceedings is that the Gold Star Memorial Bridge is more than one mile long and has 500,000 square feet of deck area—therefore, the plaintiff's description, "Northbound on the Gold Star Memorial Bridge between New London and Groton," was so vague that it could not supply the defendant with sufficient information to intelligently investigate the claim.

[12] The defendant correctly asserted that the location of injury must be furnished by the plaintiff or his representative and cannot be provided by third parties. See *Warkentin* v. *Burns*, 223 Conn. 14, 17–19, 610 A.2d 1287 (1992). The defendant is also correct that police reports cannot cure defects in the notice. See id., 17. Our Supreme Court, however, has concluded that Practice Book § 10-31 allows parties opposing motions to dismiss to submit supporting documentation as to facts not apparent on the record. See *Lussier* v. *Dept. of Transportation*, 228 Conn. 343, 357–58, 636 A.2d 808 (1994). The court in *Lussier* further held that the trial court may rely on police reports to provide context when the court determines whether the notice was so vague that it was patently defective. Id.

[13] The defendant raised this issue again in his motion for summary judgment and argued a substantially similar position to the trial court, *Cole-Chu, J.* The trial court rendered summary judgment in favor of the defendant, but declined to rule on this particular issue.

---