ROBINSON, J.
**402 *667 In this appeal, we consider whether the waiver of sovereign immunity under General Statutes § 13a-144,[1] the state's highway defect statute, **403 extends to a claim that the state police failed to close a bridge before a crew from the Department of Transportation (department) could arrive to address an icy surface on that bridge. The defendant, the Commissioner of Transportation (commissioner), appeals, upon our grant of his petition for certification,[2] from the judgment of the Appellate Court reversing the trial court's grant of summary judgment in favor of the commissioner on the ground that the personal injury action brought by the plaintiff, Barry Graham, was barred by sovereign immunity. Graham v. Commissioner of Transportation , 168 Conn. App. 570, 611, 148 A.3d 1147 (2016). On appeal, the commissioner asks us to overrule this court's decision in Lamb v. Burns , 202 Conn. 158, 520 A.2d 190 (1987), to the extent that it expands the waiver of sovereign immunity under § 13a-144 to include actions of the state police. We decline to overrule Lamb , and conclude that the waiver of sovereign immunity under § 13a-144 extends to the actions of state employees other than those employed by the commissioner, but only to the extent that they are performing duties related to highway maintenance and the plaintiff proves that a relationship exists between the commissioner and the state employee such that the commissioner can be found to have breached his statutory duty to keep the highways, bridges, or sidewalks in repair. We further conclude that, in the present case, there is nothing in the record to indicate that the requisite relationship existed between the commissioner and the **404 state police. Accordingly, we reverse in part the judgment of the Appellate Court.
The opinion of the Appellate Court sets forth the relevant facts and procedural history. "In the plaintiff's original complaint dated July 5, 2012, as later revised on May 29, 2014 ... he alleged that the [commissioner] has a statutory duty to keep and maintain all highways and bridges within the state highway system in a reasonably safe condition, and that that duty extends to Interstate 95, a public highway in that system. He further alleged that, in the early morning hours of December *668 12, 2011, employees, representatives and agents of the department became aware that the surface of Interstate 95 on the Gold Star Memorial Bridge had become icy and unreasonably dangerous, based upon reports they had received from the state police of numerous ice related accidents on the bridge that morning. The plaintiff alleged that later that morning, at 6:38 a.m., as he was driving his pickup truck in the northbound lanes of the bridge about one-tenth of one mile south of the New London-Groton town line, it slid on black ice, rolled over on its side and collided with a bridge structure, causing him serious injuries. The plaintiff alleged that the cause of his accident and resulting injuries [were due to the commissioner's] breach of his statutory duty to keep the bridge in a reasonably safe condition by failing to take adequate measures, in response to the notice he had received of its dangerous condition, either by treating its icy surface, placing or utilizing warning signs in the area to warn travelers of that dangerous condition, or closing the bridge entirely until that dangerous condition could be remedied. Finally, the plaintiff alleged that he had provided timely written notice to the [commissioner] of his intent to sue in connection with his accident and injuries within ninety days of their occurrence, as required by § 13a-144. **405 "On September 12, 2012, the [commissioner] moved to dismiss the plaintiff's original complaint on the ground that the location of the accident specified in the plaintiff's written notice of intent to sue described an area so large that it failed to satisfy the requirements of § 13a-144, in violation of the sovereign immunity doctrine. This motion was initially granted by the trial court, Devine, J. Thereafter, however, upon reconsideration of its ruling, the court determined that the language of the plaintiff's written notice was subject to at least one reasonable interpretation that could be found to satisfy the requirements of § 13a-144. Concluding, on that basis, that the adequacy of the plaintiff's written notice to apprise the [commissioner] of the location of his accident and injuries was a disputed issue of fact that should be decided by the finder of fact at trial, the court vacated its initial ruling and denied the [commissioner's] motion to dismiss.[3]
"Thereafter, on May 8, 2014, the [commissioner] moved for summary judgment on three grounds: (1) that he did not breach his statutory duty to keep and maintain the bridge in a reasonably safe condition on the morning of the plaintiff's accident because he lacked actual notice of the specific ice patch that caused that accident, and even if he had constructive notice of that ice patch, he lacked sufficient time after receiving such notice to remedy that ice patch before the plaintiff's accident occurred; (2) insofar as the plaintiff's written notice of intent to sue described the location of his accident, it failed to satisfy the requirements of § 13a-144 ; and (3) that the plaintiff could not prove that the [commissioner's] breach of statutory duty under **406 § 13a-144, if any, was the sole proximate cause of his accident and resulting injuries.
"The [commissioner] supported his motion with a memorandum of law and several attached exhibits, including: sworn affidavits from four employees of his department, Peter Silva, James F. Wilson, Jay D'Antonio and Theodore Engel; an excerpt from the certified transcript *669 of the deposition of state police Trooper Robert D. Pierce, who responded to and investigated the plaintiff's accident; and copies of the plaintiff's written notice of intent to sue in connection with his accident, Trooper Pierce's police report concerning the accident, and the department's work log for the day of the accident.
"The main thrust of the [commissioner's] argument on the first of his three grounds for seeking summary judgment, to which the trial court ultimately limited its decision on his motion, was that he did not breach his statutory duty to remedy the ice patch that caused the plaintiff's accident and injuries because, although his employees responded promptly to the first report they received of an ice related accident on the bridge that morning, they could not have reached the bridge with the necessary equipment and materials to treat its icy surface and make it reasonably safe for travel before the plaintiff's accident occurred. The department's call log showed, more particularly, that the department first was notified of icing on the bridge at 5:49 a.m. that morning, in a call from the state police to its Bridgeport operations center, of which Silva was the supervisor. That call reported that an ice related accident had occurred on the bridge at 5:40 a.m. The operations center responded to the call by implementing its standard protocol for responding to off-hour calls for service by calling D'Antonio, the supervisor of the department's maintenance garage in Waterford, which services the Gold Star Memorial Bridge, with instructions to call out a crew to salt the bridge. The Waterford garage, which **407 was then closed, routinely dispatched two man work crews, with one crew leader and one helper, to respond to off-hour calls for service. When crew members were called out to salt an icy bridge or highway, they had to drive in their own nonemergency vehicles to the garage, where the department's deicing equipment and materials were stored, open the garage with the crew leader's key, start and load the salting truck, then drive to the location where salting was to be performed. The garage had two crew leaders in December, 2011: Engel, who lived in Madison, approximately thirty to thirty-five minutes away from the garage when there was no traffic, and another unnamed person whose town of residence was not disclosed. D'Antonio assigned Engel to salt the bridge after the 5:40 a.m. accident was reported to him pursuant to his general practice of alternating off-hour call-outs between crew leaders so as not to 'unduly burden' either one of them in the busy winter season.
"After being called out at about 5:51 a.m. on December 12, 2011, Engel and his helper, William Grant, needed more than one hour to get to and open the garage, prepare and load a truck for salting operations and drive the truck to the bridge. By the time they reached the bridge, the plaintiff's accident had already occurred, and the state police, who had been on the bridge since before 6 a.m. responding to other accidents, had closed the bridge. On the basis of this evidence, the [commissioner] argued that he could not be held liable for the plaintiff's accident or injuries because he lacked sufficient time after receiving constructive notice of ice on the bridge at 5:49 a.m. to reach and treat the bridge before the plaintiff's accident occurred.
"Finally, the [commissioner] presented evidence, through Silva's sworn affidavit, that in addition to attempting to treat the bridge with salt on the morning of the plaintiff's accident, his employees attempted, at **408 6:23 a.m., to warn motorists approaching the bridge of its dangerous condition by illuminating electronic signboards positioned about one-tenth of one mile before *670 the start of the bridge in both directions, which read: 'Slippery Conditions. Use Caution.' The plaintiff, he contended, had to drive by one such illuminated signboard when he drove his truck onto the bridge approximately fifteen minutes later.
"The plaintiff opposed the [commissioner's] motion for summary judgment with his own memorandum of law and accompanying exhibits, including: an excerpt from the certified transcript of the deposition of Diana Dean, the driver who had been involved in the first ice related accident reported to the [commissioner] on the morning of the plaintiff's accident; the police report concerning the Dean accident, which was written by state police Trooper Christopher Sottile, who had responded to and investigated that accident before the plaintiff's accident that morning; an excerpt from the certified transcript of the deposition of Engel, the crew leader who had been called out to treat the bridge after the Dean accident; the sworn affidavit of Silva, the supervisor of the department's operations center in Bridgeport, who described the department's standard protocol for responding to off-hour calls and averred that the previously described electronic signboards had been illuminated before the plaintiff's accident; the plaintiff's own sworn affidavit describing his accident and the events leading up to it; another excerpt from the certified transcript of the deposition of Trooper Pierce, as to his investigation of the plaintiff's accident; the police report of Trooper Pierce concerning the plaintiff's accident; and work logs for the Waterford garage on the day of Dean's and the plaintiff's accidents.
"The plaintiff relied on these submissions to raise issues of fact as to several aspects of the [commissioner's] initial ground for seeking summary judgment. First, **409 Dean testified and [Trooper] Sottile wrote in his police report that when [Dean's] accident occurred at 5:40 a.m. on the morning of the plaintiff's accident, the entire surface of the roadway on the northbound side of the bridge was covered with black ice, which caused her vehicle to spin out of control in the right lane of the five lane bridge and continue spinning all the way across the bridge until it crashed into the cement barrier on the opposite side of the roadway. Second, the plaintiff averred in his affidavit and Trooper Pierce confirmed in his police report that when the plaintiff's accident occurred almost one hour after the Dean accident, the entire surface of the roadway on the northbound side of the bridge was still completely covered with black ice. Third, Engel testified, based upon his three years of experience working at the Waterford garage in the winter, that when the outside temperature falls below freezing, the surface of the Gold Star Memorial Bridge, unlike those of other nearby bridges, is prone to freezing over completely, with black ice of the kind he saw on the morning of December 12, 2011, due to the recurring presence of ice fog in the area. The [commissioner's] work logs confirmed that the air temperature at 6 a.m. on that date was 27 degrees Fahrenheit, and the surface temperature of the roadway was 24 degrees Fahrenheit. Fourth, although Silva averred in his affidavit that electronic signboards warning of slippery conditions on the bridge had been illuminated before the plaintiff drove onto the bridge on the morning of his accident, both the plaintiff and Engel swore that they had not seen any such warning signs when they drove onto the northbound lanes of the bridge several minutes later. Fifth, shortly after the plaintiff's accident took place, the state police closed the northbound lanes of the bridge entirely until its icy surface could be treated by department personnel. *671 "In light of the foregoing evidence, the plaintiff claimed that the [commissioner] was not entitled to **410 summary judgment on the first ground raised in his motion because the reasonableness of a [commissioner's] response to notice he receives of ice on a bridge or highway is a multifactorial factual issue that must typically be decided by the finder of fact at trial. Here, in particular, the plaintiff claimed that he had presented evidence raising several genuine issues of material fact about factors upon which the ultimate resolution of that issue in this case depends. Those issues included: whether the [commissioner] had actual notice of the dangerous icing condition that caused [the plaintiff's] accident and injuries based upon the reported observations by the state police of black ice covering the entire northbound surface of the bridge from almost one hour before the plaintiff's accident until the state police responded to it well after it occurred; whether, in light of the magnitude of the danger presented by the pervasive icing condition of which the [commissioner] had notice, as evidenced by the numerous ice related accidents it had caused in subfreezing weather conditions known to cause icing due to ice fog, it was reasonable for the [commissioner] to call out [people from] a work crew that predictably could not reach the bridge and treat it until more than one hour after they were first called out; whether, if [people from] a work crew called out to treat the bridge could not reasonably be expected to treat it for more than one hour after they were first called out, adequate measures were taken in the interim to warn motorists still using it of its dangerous icing condition before that condition was remedied; and whether, if the bridge could not be treated more quickly and the motoring public could not be warned more effectively of its dangerous condition before it was treated, the bridge should have been closed to all traffic before, not after, the plaintiff's accident. In light of those open, contested issues, the plaintiff insisted that the reasonableness of the [commissioner's] response to the **411 black ice condition reported to the department before the plaintiff's accident presented a genuine issue of material fact that should be decided by the finder of fact at trial.
"On January 12, 2015, the trial court, Cole-Chu, J. , heard oral argument on the [commissioner's] motion for summary judgment, at which the foregoing arguments were presented. Thereafter, on May 12, 2015, the trial court granted the [commissioner's] motion for summary judgment. In its memorandum of decision, the trial court held that 'despite ... the drawing of inferences in the light most favorable to the nonmoving party ... the court concludes that the [commissioner] is entitled to judgment as a matter of law. The court cannot conclude that the [commissioner] had actual notice of the black ice condition which caused the plaintiff's accident before the report of that accident. Even treating the black ice on the bridge in general as the defect which caused the plaintiff's accident and treating the black ice accident on the same bridge fifty minutes before the plaintiff's accident as constructive notice to the [commissioner] of that defect, the court finds as a matter of law that the [commissioner's] response time was reasonable. Indeed, the plaintiff does not contend otherwise, other than by claiming that the [commissioner] should have anticipated the black ice condition.' "[4]
*672 (Footnotes added and omitted.) Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 575-83, 148 A.3d 1147.
Thereafter, the plaintiff appealed to the Appellate Court, claiming that "the trial court erred in rendering **412 summary judgment in favor of the [commissioner] because the evidence before it on the [commissioner's] motion, when considered in the light most favorable to the plaintiff, gave rise to a genuine issue of material fact as to whether the [commissioner] had sufficient time, after receiving actual or constructive notice of the dangerous icing condition that caused his accident, to remedy that condition before the accident occurred." Id., at 574, 148 A.3d 1147. The commissioner disagreed, claiming that summary judgment was proper because he had insufficient time, after receiving notice of the icing condition, to remedy the condition before the plaintiff's accident.[5] Id. The Appellate Court concluded that there were genuine issues of material fact as to whether and when the commissioner received actual notice of the specific defect that caused the plaintiff's injury, and that the determination of the reasonableness of the commissioner's response to that notice should be made by the trier of fact. Id., at 595, 603, 148 A.3d 1147.
The Appellate Court then turned to a consideration of whether the commissioner failed to make adequate use of available temporary remedies-such as the use of a warning sign or closing the bridge-to protect travelers before the department could physically treat the icy condition. Id., at 598, 148 A.3d 1147. The Appellate Court relied on this court's holding in Lamb v. Burns , supra, 202 Conn. at 169, 520 A.2d 190, for the proposition that, "[w]ith respect to the conduct of the state police, our courts have held **413 that [t]he words the legislature employed in § 13a-144 unambiguously support the conclusion that the statute waives sovereign immunity for defective highway claims based upon the neglect or default not merely of the commissioner of transportation, but of the state or any of its employees , at least when performing duties related to highway maintenance." (Emphasis in original; internal quotation marks omitted.) Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 601, 148 A.3d 1147. Thus, the court ultimately concluded that "there is a genuine issue of material fact as to whether the failure of the state police to close the bridge before the plaintiff's accident occurred was unreasonable and whether the conduct of the state police can provide a basis for finding the [commissioner] liable under § 13a-144." Id., at 603, 148 A.3d 1147. The Appellate Court reversed the judgment of the trial court and remanded the case with direction to deny the commissioner's motion for summary judgment and for further proceedings consistent with its opinion. Id., at 611, 148 A.3d 1147. This certified appeal followed. See footnote 2 of this opinion. *673 On appeal, the commissioner claims that the waiver of sovereign immunity under § 13a-144 does not extend to the plaintiff's claim that the state police were negligent in failing to close the bridge before a department crew could arrive to address the icy condition. Specifically, the commissioner contends that, to the extent that this court's decision in Lamb v. Burns , supra, 202 Conn. at 158, 520 A.2d 190, extends the waiver of sovereign immunity under § 13a-144 to include actions of the state police, it was wrongly decided and should be overruled. The commissioner relies on this court's decision in White v. Burns , 213 Conn. 307, 323, 567 A.2d 1195 (1990), which explained that "the terms 'neglect' and 'default' [contained in § 13a-144 ] refer solely to that action or failure to act by the commissioner which triggers liability for breach of his statutory duty to repair and maintain **414 the state highway." The commissioner also argues that, under White , "[t]he commissioner ... is the only one upon whom is imposed the duty to repair under § 13a-144." (Emphasis in original.) Id., at 326, 567 A.2d 1195. Thus, the commissioner contends that " § 13a-144, strictly construed, waives sovereign immunity only with respect to the neglect or default of the commissioner ... or his employees in connection with road maintenance and repair."
In response, the plaintiff contends that the Appellate Court properly concluded that the plain and unambiguous language of § 13a-144 imposes liability on the commissioner for actions of the state or any of its employees. The plaintiff further argues that we should not overrule Lamb because this court cited it favorably in White , recognizing that the actions of the state and its employees can ripen into a claim against the commissioner, with the legislature's failure to amend § 13a-144 in light of Lamb indicating its validation of that decision. We agree with the plaintiff that Lamb remains good law and conclude that, strictly construed, § 13a-144 waives sovereign immunity for the actions of state employees, but only to the extent that they are performing duties related to highway maintenance and the plaintiff proves that a relationship exists between the commissioner and the state employee such that the commissioner can be found to have breached his statutory duty to keep the highways, bridges, or sidewalks in repair. We further conclude that there is no evidence in the record of the present case to establish the requisite relationship between the commissioner and the state police.
It is well established that " Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for **415 summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party.... The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law.... On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court.... Our review of the trial court's decision to grant [a party's] motion for summary judgment is plenary." (Internal quotation marks omitted.) Stewart v. Watertown , 303 Conn. 699, 709-10, 38 A.3d 72 (2012).
The general principles governing sovereign immunity are well established. "[W]e have long recognized the validity of *674 the common-law principle that the state cannot be sued without its consent ...." (Internal quotation marks omitted.) Cox v. Aiken , 278 Conn. 204, 211, 897 A.2d 71 (2006). "The practical and logical basis of the doctrine is today recognized to rest on ... the hazard that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds, and property." (Internal quotation marks omitted.) Horton v. Meskill , 172 Conn. 615, 624, 376 A.2d 359 (1977). Thus, the doctrine of sovereign immunity "operates as a strong presumption in favor of the state's immunity from liability or suit." (Internal quotation marks omitted.) Hicks v. State , 297 Conn. 798, 801, 1 A.3d 39 (2010). "Nevertheless, a plaintiff may surmount this bar against suit if, inter alia, he can demonstrate that the legislature, either expressly or by force of a necessary implication, statutorily waived the state's sovereign immunity ...." (Internal quotations marks omitted.) **416 Conboy v. State , 292 Conn. 642, 649, 974 A.2d 669 (2009). "When the legislature intends to waive immunity from suit or liability, it expresses that intent by using explicit statutory language." Rivers v. New Britain , 288 Conn. 1, 12, 950 A.2d 1247 (2008).
Accordingly, we must consider whether § 13a-144 operates as a waiver of sovereign immunity with respect to the actions of the state police, which presents a question of statutory construction that constitutes a question of law over which our review is plenary. Gonzalez v. O & G Industries, Inc. , 322 Conn. 291, 302, 140 A.3d 950 (2016). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply.... In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.... When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter ...." (Internal quotation marks omitted.) Id., at 302-303, 140 A.3d 950. "[S]tatutes in derogation of common law should receive a strict construction and [should not] be extended, modified, repealed or enlarged in its scope by the mechanics of construction." (Internal quotation marks omitted.) Williams Ford, Inc. v. Hartford Courant Co. , 232 Conn. 559, 581, 657 A.2d 212 (1995).
**417 Importantly, statutes in derogation of sovereign immunity "are few and narrowly construed under our jurisprudence." (Internal quotation marks omitted.) Hicks v. State , supra, 297 Conn. at 801, 1 A.3d 39. Thus, when "there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in sovereign immunity." (Emphasis in original; internal quotation marks omitted.) Envirotest Systems Corp. v. Commissioner of Motor Vehicles , 293 Conn. 382, 388, 978 A.2d 49 (2009).
*675 Moreover, in considering the commissioner's claim that we should overrule our construction of § 13a-144 in Lamb , we are mindful that "[t]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it.... Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency.... It is the most important application of a theory of [decision-making] consistency in our legal culture and ... is an obvious manifestation of the notion that [decision-making] consistency itself has normative value....
"[I]n evaluating the force of stare decisis, our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute.... When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. Sometimes, when we have made such a determination, the legislature instructs us that we have misconstrued its intentions. We are bound by the instructions so provided.... More often, however, the legislature takes no further action to clarify its intentions. Time and **418 again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute.... Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) Spiotti v. Wolcott , 326 Conn. 190, 201-202, 163 A.3d 46 (2017).
We begin, then with the language of § 13a-144, which allows a person injured "through the neglect or default of the state or any of its employees by means of any defective highway ... which it is the duty of the [commissioner] to keep in repair" to bring a civil action against the commissioner. In order to satisfy § 13a-144, "the plaintiff must prove by a preponderance of the evidence: (1) that the highway was defective as claimed; (2) that the defendant actually knew of the particular defect or that, in [exercising] supervision [over] highways ... should have known of that defect; (3) that the defendant, having actual or constructive knowledge of this defect, failed to remedy it having had a reasonable time, under all the circumstances, to do so; and (4) that the defect must have been the sole proximate cause of the injuries and damages claimed, which means that the plaintiff must prove freedom from contributory negligence." (Internal quotation marks omitted.) Ormsby v. Frankel , 255 Conn. 670, 675-76, 768 A.2d 441 (2001).
This court first had occasion to address whether the waiver of sovereign immunity under § 13a-144 was limited only to the actions of the department's employees in Lamb v. Burns , supra, 202 Conn. at 158, 520 A.2d 190. In Lamb , the plaintiff brought an action against the commissioner under § 13a-144 after the vehicle she was driving slid on a patch of ice and struck a guard post. Id., at 159, 520 A.2d 190.
**419 The evidence at trial showed that the state police had received a call about the same ice patch seventy-five minutes prior to the plaintiff's accident and, thereafter, arrived on the scene thirty-five minutes before the accident to "investigate the road condition." Id., at 159-60, 520 A.2d 190. Shortly after arriving on scene, the *676 state police notified the local department garage of the icy condition. Id., at 160, 520 A.2d 190. Similar to the present case, because the call was received when the garage was closed, this was an off-hour call about the icy road conditions. Id. The responding officer decided to light road flares before leaving the scene to check on another area. Id. After the flares burnt out, but before the department's crew could arrive, the plaintiff drove over the ice patch, lost control of her vehicle, and struck the guard post. Id.
In Lamb , this court held that § 13a-144"waives sovereign immunity for defective highway claims based upon the neglect or default not merely of the [commissioner], but of the state or any of its employees, at least when performing duties related to highway maintenance ."[6] (Emphasis added; internal quotation marks omitted.) Id., at 169, 520 A.2d 190. Specifically, the court rejected the argument that the word " 'any' " in the statutory phrase " 'through the neglect or default of the state or any of its employees,' " should be read to include only department employees.[7] (Emphasis added.) Id., at 169-70, 520 A.2d 190. Thus, this court concluded that the waiver of sovereign immunity set forth in § 13a-144 extended not only to the actions of department employees, but also to the actions of any **420 state employees while engaged in highway maintenance. Id., at 169-71, 520 A.2d 190.
This court's decision in Lamb went on to emphasize the importance of establishing a relationship between the negligent state employee and the commissioner where there is evidence that the commissioner was looking to someone other than a department employee to discharge his statutory duty to keep the highways, bridges, and sidewalks in repair. The court explained that, "[a]lthough the state police are not statutorily charged with duties that concern the repair or maintenance of state highways ... the evidence in the present case indicates that by custom the commissioner ... has availed himself of the assistance of the state police and that the state police have assumed such duties." (Citation omitted.) Id., at 171, 520 A.2d 190. Importantly, the court noted that the record contained "testimony that it [was] a state trooper's 'duty ' and 'usual procedure ' to report defects found in the highway." (Emphasis added.) Id. Moreover, there was evidence that a procedure existed by which the department made available to the state police the home phone numbers of its maintenance supervisors for off-hour use. Id. Thus, although Lamb 's interpretation of § 13a-144 allows the actions of state employees beyond those employed by the department to subject the commissioner to liability, it narrows the scope of that potential liability by requiring that (1) the employee be engaged in highway maintenance, and (2) the plaintiff prove the existence of a Lamb type relationship between the state employee and the commissioner.
We decline the commissioner's invitation to overrule Lamb . It is well settled that, "[i]n evaluating the force of stare *677 decisis, our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute." (Internal quotation marks omitted.) **421 Spiotti v. Wolcott , supra, 326 Conn. at 201, 163 A.3d 46. Among the factors that may justify overruling a prior decision interpreting a statute are "intervening developments in the law, the potential for unconscionable results, the potential for irreconcilable conflicts and difficulty in applying the interpretation." Id., at 202, 163 A.3d 46. These principles militate strongly against overruling our decision in Lamb . First, in the more than thirty years since Lamb was decided, the legislature has taken no action that would suggest that it disagreed with our conclusion that § 13a-144 extends to state employees that are performing duties related to highway maintenance when the plaintiff can demonstrate that a Lamb type relationship exists between the state employee and the commissioner. Thus, we presume that the legislature acquiesces in that interpretation. See, e.g., id., at 203, 163 A.3d 46 ; State v. Ray , 290 Conn. 602, 615, 966 A.2d 148 (2009).
Moreover, the conclusion in Lamb that the waiver of sovereign immunity under § 13a-144, while not limited to department employees alone, is constrained by the requirements that the employee be engaged in highway maintenance and be in a Lamb type relationship with the commissioner, is consistent with the purpose of the statute and has not been undermined by subsequent case law. Since our decision in Lamb , we have stated that "[t]he state highway liability statute imposes the duty to keep the state highways in repair upon the ... commissioner ...." (Emphasis added.) White v. Burns , supra, 213 Conn. at 321, 567 A.2d 1195. Specifically, in White , this court explained that "[i]t is only through the 'neglect' and 'default' of human character on the part of 'the state or any of its employees' that a violation of the duty statutorily imposed on the commissioner ripens into liability because of injury caused 'by means of any defective highway.' See General Statutes § 13a-144.... [T]he terms 'neglect' and 'default' refer solely to that action or failure to act by the commissioner which triggers liability for breach of his statutory duty **422 to repair and maintain the state highway ." (Citations omitted; emphasis added; footnote omitted.) White v. Burns , supra, at 322-23, 567 A.2d 1195. Importantly, "[t]he commissioner ... is the only one upon whom is imposed the duty to repair under § 13a-144." (Emphasis in original.) Id., at 326, 567 A.2d 1195. In other words, under § 13a-144, the commissioner alone is responsible for the maintenance of the state's highways, and, accordingly, he alone is liable for a breach of that duty.
In light of the foregoing, and mindful that we are to strictly construe waivers of sovereign immunity in favor of the state; e.g., Envirotest Systems Corp. v. Commissioner of Motor Vehicles , supra, 293 Conn. at 388, 978 A.2d 49 ; we disagree with the plaintiff's argument that the waiver of sovereign immunity under § 13a-144 extends to the actions of any state employee without regard to that employee's relationship to the commissioner. Extending § 13a-144 to include the negligence of any state employee, not otherwise engaged in highway maintenance and not in a Lamb type relationship with the commissioner, constitutes an expansion of potential liability on the state that is not within the clear reach of the statute. It cannot be that § 13a-144 waives sovereign immunity as to the commissioner for the actions of any state employee without regard to whether that employee was engaged in the business that it is the commissioner's duty to oversee; that would be far too broad and attenuated from the highway maintenance purpose of the statute. If that were the case, *678 the floodgates would open, and the commissioner could well be held liable for the actions of any state employee regardless of his or her affiliation with the department. Thus, construing § 13a-144 to extend to the action of any state employee without regard to his or her relationship with the commissioner would lead to an absurd result.[8] See, e.g., **423 In re Jusstice W. , 308 Conn. 652, 670, 65 A.3d 487 (2012) ("[w]e construe a statute in a manner that will not ... lead to absurd results" [internal quotation marks omitted] ); Wallingford v. Werbiski , 274 Conn. 483, 491, 877 A.2d 749 (2005) ("this [court presumes] that the legislature intends to create statutes with reasonable and rational results" and "will not interpret statutes in such a way that would lead to a 'bizarre or absurd result' "). For example, taking the plaintiff's argument to its logical extension, if a Department of Social Services employee-whose job has nothing to do with highway maintenance and who the commissioner has no authority to oversee-was driving along any portion of the state's highways[9] and came upon a defective condition, but failed to alert the commissioner, this would be a neglect of the commissioner's duty under § 13a-144.[10] This outcome would *679 greatly **424 expand the scope of the sovereign immunity waiver under § 13a-144, in a manner inconsistent with the narrow interpretation that we afford to such statutes. See, e.g., Hicks v. State , supra, 297 Conn. at 801, 1 A.3d 39 ; Envirotest Systems Corp. v. Commissioner of Motor Vehicles , supra, at 388, 978 A.2d 49.
Accordingly, we view the analysis set forth in Lamb , which narrows the scope of potential liability through the waiver of sovereign immunity by requiring proof that the state employee is engaged in highway maintenance and that a relationship exists between the state employee and the commissioner, as responsive to the **425 commissioner's primary argument in support of overruling Lamb , namely, that he alone is statutorily responsible for the maintenance of the state's highways and he alone is liable for a breach of that duty. The commissioner's concerns are assuaged by Lamb 's narrowing of the scope of potential liability under § 13a-144. Thus, we decline to overrule our decision in Lamb .
Applying the standard set forth in Lamb to the facts of the present case, we observe that there is almost no evidence in the record before us regarding the nature of the relationship between the state police and the commissioner. Evidence of the relationship must be sufficient to establish a connection between the negligent actions of the state employee in remedying the highway defect and the commissioner's statutory duty, such that the commissioner can be found to have breached his duty.[11] Unlike the facts in Lamb , which established that by custom the commissioner had regularly "availed himself of the assistance of the state police and that the state police [had] assumed [those] duties," the plaintiff has presented no evidence of the custom between the state police and the commissioner in this case. See Lamb v. Burns , supra, 202 Conn. at 171, 520 A.2d 190. Specifically, in Lamb , there was evidence that it was the state trooper's "duty" and "usual procedure" to report highway defects. (Internal quotation marks omitted.) Id. In the present case, the only evidence in the record addressing the nature of the relationship between the state police and the commissioner is a few sentences in the affidavit of the supervisor of the Bridgeport operations center, Silva. In that affidavit, Silva explains that the "[d]epartment relies on calls **426 into its highway operations centers during off hours to advise it of road conditions." Further, Silva also notes that "off-hour *680 calls ... come predominately from state and local police" and that the police "are advised to call the operations center" when they feel the road conditions require the department's response. That the police may call the operations center does not establish that it was the state trooper's "duty" or even "usual procedure" to report highway defects or that the state police had accepted those duties, as required by Lamb . (Internal quotation marks omitted.) Lamb v. Burns , supra, at 171, 520 A.2d 190.
Moreover, in Lamb , the evidence "established [that a] procedure exist[ed] by which [the department made] available to the state police a list of the home phone numbers of its maintenance supervisors for use after hours and on weekends." Id. Not only is there no evidence of such a procedure in the present case, but there is evidence to the contrary. The department first became aware of the icy condition on the bridge "in a call from the state police to [the department's] Bridgeport operations center," which in turn contacted the maintenance supervisor. Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 578, 148 A.3d 1147. Even though the incident on the bridge occurred during off-hours-the initial call to the department was made at 5:49 a.m.-the state police did not contact the department supervisor on his home phone.[12] Thus, the limited **427 evidence of the nature of the relationship between the state police and the commissioner in this case was not sufficient to show the existence of a genuine issue of material fact as to the issue of whether the requisite relationship existed. At most, the limited relevant information in Silva's affidavit establishes that, at times, the state police call the operations center. There is no evidence that this is their duty to do so or that such calls are made as part of a formal procedure between the state police and the commissioner. In addition to calls from the police, the operations center receives calls from the public reporting defects. Thus, it is not even clear whether the police call in their official capacity or as members of the concerned public. Although both Lamb and the present case took place in the same region of the state, the incident in Lamb took place more than thirty years ago, and the plaintiff has presented no evidence that a similar relationship continues to exist between the state police and the commissioner. Accordingly, the sole factual issue remaining in this case is the reasonableness of the commissioner's response to the highway defect after receiving notice from the state police. In the absence of proof of a Lamb type relationship between the state police and the commissioner, the interim measures employed by the state police, or lack thereof, are of no consequence.[13] Accordingly, because we *681 conclude that there is no evidence establishing a Lamb type relationship between the state police and the commissioner,[14] the commissioner **428 cannot be held liable for the failure of the state police to close the bridge.
The judgment of the Appellate Court is reversed only as to the conclusion in part I B 3 of its opinion that § 13a-144 extends to the conduct of the state police in failing to close the bridge, and the case is remanded to that court with direction to affirm the trial court's judgment with respect to that claim; the judgment of the Appellate Court is affirmed in all other respects.
In this opinion McDONALD, KAHN and VERTEFEUILLE, Js., concurred.
I would affirm the judgment of the Appellate Court on the first certified issue,[1] and I therefore respectfully dissent.
**429 The plaintiff, Barry Graham, alleges that on December 12, 2011, he was driving his pickup truck in the northbound lanes of the Gold Star Memorial Bridge, about one-tenth of one mile south of the New London-Groton town line, when at 6:38 a.m. his vehicle slid on black ice, rolled over on its side and collided with a bridge structure, causing him serious injuries. Graham v. Commissioner of Transportation , 168 Conn. App. 570, 575, 148 A.3d 1147 (2016). The record discloses that the state police first notified the Department of Transportation (department) of icing on the bridge at 5:49 a.m. that same morning in a call to the department's Bridgeport operations center. Id., at 578, 148 A.3d 1147. That call-one of several accounts of ice related accidents on the bridge that the state police relayed to the department early that morning-reported that an ice related accident had occurred on the bridge at 5:40 a.m. Id., at 578, 602, 148 A.3d 1147.
Because it was so early in the morning, the department implemented its "off-hour"
*682 protocols, and department personnel were dispatched to salt the bridge. Id., at 578-79, 148 A.3d 1147. The Appellate Court held that there is a genuine issue of material fact as to whether and when the department received actual notice of what the plaintiff alleges to be the highway "defect" (i.e., ice) that caused his injuries.[2] Id., at 595, 148 A.3d 1147. The issue of the department's negligence is not before us.
The Appellate Court also held that there was a "genuine issue of material fact as to whether the state police responded unreasonably to the icing condition of the **430 bridge by failing to close the road before the plaintiff's accident." Id., at 601-602, 148 A.3d 1147. Assessing the response of the state police to "off-hour" highway conditions within an action brought pursuant to our defective highway statute, General Statutes § 13a-144, is not without precedent. This court had a very similar case more than thirty years ago in Lamb v. Burns , 202 Conn. 158, 520 A.2d 190 (1987). In that case, this court rejected the argument by the defendant, the Commissioner of Transportation (commissioner), that "because the statutory duty of maintaining and repairing the state's highways is upon the [commissioner] and his agents alone ... the negligence of the state police cannot properly underlie a cause of action against the defendant under § 13a-144." (Citations omitted.) Id., at 169, 520 A.2d 190. Rather, the court held that the language of § 13a-144"unambiguously support[s] the conclusion that the statute waives sovereign immunity for defective highway claims based upon the 'neglect or default' not merely of the commissioner of transportation, but 'of the state or any of its employees,' at least when performing duties related to highway maintenance ." (Emphasis added.) Id.
Today's majority, however, distinguishes the present case from Lamb , holding instead that whether a court has jurisdiction to entertain a claim by a motorist injured on our state highways under our defective highway statute turns on whether the plaintiff brings forth evidence "sufficient to establish a connection between the negligent actions of the state employee in remedying the highway defect and the commissioner's statutory duty, such that the commissioner can be found to have breached his [statutory] duty." I disagree with the majority's interpretation of our defective highway statute and its reinterpretation of Lamb v. Burns , supra, 202 Conn. at 158, 520 A.2d 190, a precedent that has governed how persons injured on this state's highways have brought claims **431 against the state for more than thirty years, without legislative reaction.
First, the text of § 13a-144 does not limit its waiver of sovereign immunity in the way the majority holds. Second, I do not agree with the majority's view that Lamb "narrow[ed] the scope of potential liability" under the defective highway statute by requiring evidence of what the majority refers to as a " Lamb type relationship" between the commissioner and the negligent state employee to fit within the statute's sovereign immunity waiver when a plaintiff alleges that someone other than the commissioner's employees was negligent.
*683 Obviously, Lamb could neither have added to nor subtracted from the statute's meaning. Third, although the majority declines the commissioner's invitation to overrule Lamb , it has, in my view, reinterpreted its holding in a way that mixes concepts of sovereign immunity, duty and liability. In doing so, I believe the statutory right of recovery for those injured on our state highways has been limited in a way the legislature did not intend, and in a way that is impractical and will lead unnecessarily to multiple actions.
Because I believe the Appellate Court properly construed and applied § 13a-144 and our decision in Lamb , I would affirm its judgment on the first certified question.
I
As we did in Lamb , we must first consider the language of the statute before turning to case law. See General Statutes § 1-2z.[3] The first sentence of **432 § 13a-144, which contains an express legislative waiver of sovereign immunity, provides in relevant part: "Any person injured in person or property through the neglect or default of the state or any of its employees by means of any defective highway, bridge or sidewalk which it is the duty of the Commissioner of Transportation to keep in repair ... may bring a civil action to recover damages sustained thereby against the commissioner in the Superior Court...."[4] *684 (Emphasis added.) It is **433 true that we are obliged to construe waivers of sovereign immunity narrowly. Hicks v. State , 297 Conn. 798, 801, 1 A.3d 39 (2010). But the plain language of the waiver contained in § 13a-144 sweeps broadly, reaching allegations of neglect or default "of the state or any of its employees," and not just of the department, its employees or those with a relationship to the commissioner. In contrast, the legislature took pains to limit otherwise broad language within the same statute. For example, the broad term, "[a]ny person injured," is limited by the manner ("through the neglect or default") and means ("by means of any defective highway") of the injury. General Statutes § 13a-144. Similarly, the broad term, "any defective highway, bridge or sidewalk," is limited by the duty of the commissioner ("which it is the duty of the Commissioner of Transportation to keep in repair"). General Statutes § 13a-144 ; see Lamb v. Burns , supra, 202 Conn. at 170, 520 A.2d 190. In my view, if the legislature had intended the scope of the waiver to reach only "the neglect or default" of those with some demonstrable "relationship" to the commissioner, it would not have included the broad and unqualified phrases, "of the state" (i.e., the entire state), or "any of its employees ...." General Statutes § 13a-144.
A conclusion that the waiver of immunity extends beyond the negligence of department employees-and beyond employees in some "relationship" with the commissioner-is bolstered by a review of the entire statute, which we are obliged to consider. See, e.g., Bennett v. New Milford Hospital, Inc. , 300 Conn. 1, 22, 12 A.3d 865 (2011). It is true the statute requires that any action must be brought against the commissioner, that notice must be provided to the commissioner, and that the commissioner may make an offer of judgment with the **434 attorney general's approval and the trial court's consent. General Statutes § 13a-144. However, the statute also refers to "the state" generally as the party ultimately responsible to the injured person. The state is referred to as holding the relevant insurance policies, paying the judgment, and "be[ing] subrogated to the rights of such injured person ...." General Statutes § 13a-144 ; see footnote 4 of this dissenting opinion.
The fact that the statute's text directs plaintiffs to bring the action against the commissioner is unremarkable. After all, an action brought under § 13a-144 is brought against the commissioner in his official capacity; Rivers v. New Britain , 288 Conn. 1, 5, 950 A.2d 1247 (2008) ; and a "suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state." (Internal quotation marks omitted.) Chief Information Officer v. Computers Plus Center, Inc ., 310 Conn. 60, 79-80, 74 A.3d 1242 (2013) ; see also Hillson v. State , Superior Court, judicial district of Hartford, Docket No. CV-12-6030605-S, 2014 WL 4815016 (August 20, 2014) (58 Conn. L. Rptr. 836) ( § 13a-144 action against the state). Ultimately, any adverse judgment is "paid by the state" out of the commissioner's appropriation for highway repairs. General Statutes § 13a-144. Moreover, as with the "neglect or default" requirement, a conclusion that § 13a-144 extends to employees beyond the department comports with the other elements of a § 13a-144 action, as laid out in Ormsby v. Frankel , 255 Conn. 670, 675-76, 768 A.2d 441 (2001). Specifically, the plaintiff in a § 13a-144 action must prove, among other things, that the *685 defendant knew of the highway defect. Just like the "neglect or default" element, this can be satisfied by pointing to evidence that "the state or any of its employees"-and not only the commissioner-had the requisite knowledge. General Statutes § 13a-144. **435 Applying the plain language of the statute's sovereign immunity waiver, the Appellate Court concluded that "there is a genuine issue of material fact as to whether the failure of the state police to close the bridge before the plaintiff's accident occurred was unreasonable ...." Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 603, 148 A.3d 1147. If, as the Appellate Court construed his claim, the plaintiff contends that state police employees breached their duty to close the bridge under the circumstances; see id., at 601-602, 148 A.3d 1147 ; his claim surely constitutes an allegation of "neglect or default of the state or any of its employees" pursuant to § 13a-144.
In my view, this was this court's interpretation of the statute in Lamb and should remain our interpretation.
II
The majority posits that our decision in Lamb "narrow[ed] the scope of potential liability" under § 13a-144 by waiving sovereign immunity for the "actions of state employees other than those employed by the commissioner, but only to the extent that they are performing duties related to highway maintenance and the plaintiff proves that a relationship exists between the commissioner and the state employee ...." I do not agree, however, that our decision in Lamb , like the statute itself, requires proof of such a relationship to overcome sovereign immunity.
Lamb involved facts similar to the present case. The plaintiffs in both cases claimed their injuries were caused by icy road conditions: in Lamb , on a Saturday afternoon; Lamb v. Burns , supra, 202 Conn. at 159, 520 A.2d 190 ; in the present case, at 6:38 a.m. Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 575, 148 A.3d 1147. In both cases, department officials and crews were not on duty, and the plaintiffs claimed that the state police had failed to take appropriate steps to remedy the icy conditions. Lamb v. Burns , supra, at 160, 169, 520 A.2d 190 ;
**436 Graham v. Commissioner of Transportation , supra, at 582, 148 A.3d 1147. In Lamb , a state police trooper called for a sand truck, lit flares and left the site. Lamb v. Burns , supra, at 160, 520 A.2d 190. After the flares had expired, but before the sand truck arrived, the plaintiffs slid on the ice, and struck a guard post and a concrete bridge abutment. Id., at 159-60, 520 A.2d 190. In the present case, the plaintiff argues that the state police failed to close the bridge, despite knowing that other cars had slid on the black ice.
Important to an understanding of the court's precise reasoning in Lamb is that, like the present case, the proceedings in the trial court did not involve the issue of sovereign immunity. A jury had found for the plaintiff in Lamb and awarded damages. Id., at 159, 520 A.2d 190. On appeal, this court reversed the judgment on the basis of our conclusion that the trial court had unduly limited the commissioner's voir dire of prospective jurors. Id., at 165-66, 520 A.2d 190. The court went on to address whether the jury was properly instructed that a breach of duty by the state police-and not just the department-could serve as a basis for a defective highway action only because it "may arise at a new trial." Id., at 166, 520 A.2d 190 ; see Practice Book § 84-11 (c) ; Weaver v. McKnight , 313 Conn. 393, 397, 97 A.3d 920 (2014) (reviewing, pursuant to Practice Book § 84-11, *686 evidentiary rulings of trial court likely to arise on remand).
The court in Lamb rejected the commissioner's "general claim" that "the trial court erred in instructing the jury that negligence on the part of the state police could provide a basis for finding the defendant liable under § 13a-144." Lamb v. Burns , supra, 202 Conn. at 166, 520 A.2d 190. Specifically, the court rejected the commissioner's argument that "because the statutory duty of maintaining and repairing the state's highways is upon the defendant and his agents alone ... the negligence of the state police cannot properly underlie a cause of action **437 against the defendant under § 13a-144." (Citations omitted.) Id., at 169, 520 A.2d 190.
We held instead that "[t]he words the legislature employed in § 13a-144 unambiguously support the conclusion that the statute waives sovereign immunity for defective highway claims based upon the 'neglect or default' not merely of the commissioner of transportation , but 'of the state or any of its employees,' at least when performing duties related to highway maintenance." (Emphasis added.) Id. We rejected the commissioner's argument that the phrase, "highway ... which it is the duty of the highway commissioner to keep in repair," in any way limited the state employees whose negligence might lead to liability. (Internal quotation marks omitted.) Id., at 169, 520 A.2d 190. Rather, the phrase described "those highways to which the state's liability may attach." Id. In short, the phrase is about roads, not employees: that is, the phrase, "highway ... which it is the duty of the highway commissioner to keep in repair"; (internal quotation marks omitted) id. ; describes the roads for which the state may be liable under the statute, not the employees whose negligence is covered by the statute. See Amore v. Frankel , 228 Conn. 358, 368-69, 636 A.2d 786 (1994) (upholding dismissal of action under § 13a-144 when plaintiff did not respond to commissioner's affidavits averring that department was not responsible for driveway at issue); see also Cairns v. Shugrue , 186 Conn. 300, 310, 441 A.2d 185 (1982) (plain meaning of § 13a-144 renders state liable for defects on any highway that commissioner has duty to maintain).
In Lamb , we also disagreed with the commissioner's contention that the word "any" within the phrase, "through the neglect or default of the state or any of its employees," in § 13a-144 should "be interpreted in a restrictive sense to refer only to [department] employees." Lamb v. Burns , supra, 202 Conn. at 169, 520 A.2d 190. Rather, we **438 stated simply: "There are no words in § 13a-144 limiting or restricting the scope of the phrase 'the state or any of its employees' to [department] employees only." Id., at 170, 520 A.2d 190.
Having concluded that we "perceive[d] no ambiguity in the language" used in the statute; id. ; we nonetheless went on to note that there was no legislative history "to shed light on the original purpose of the phrase 'through the neglect or default of the state or any of its employees' " in § 13a-144. Id. We observed, however, that both earlier and present revisions of the statute "implie[d] that the commissioner is not relieved of potential liability when he calls upon the assistance of a contractor or other person from outside his department to perform highway maintenance operations." Id., at 171, 520 A.2d 190.
Finally, we noted in Lamb that the evidence indicated "that by custom the commissioner of transportation has availed himself of the assistance of the state police and that the state police have assumed such duties." Id. Because there was evidence that the state police had assumed a duty that the department had relied on, we *687 concluded that "[t]he trial court's jury instructions to that effect, therefore, were not erroneous." Id.
My reading of Lamb is that all a plaintiff must allege to fit within the sovereign immunity waiver embodied in § 13a-144 is that the "neglect or default of the state or any of its employees" (including state police employees) took place while performing duties related to highway maintenance. I do not read Lamb to restrict the otherwise broad reach of the statute's unambiguous sovereign immunity waiver. Nor could it. The breadth of the statute speaks for itself. As I discuss next, the portion of Lamb the majority relies on as now requiring proof of the negligent employee's "relationship" with the commissioner was not dispositive of the sovereign **439 immunity issue but, at most, went to the issue of whether the jury was properly instructed on the issue of duty.
III
Although the majority indicates it is reaching only the first certified question (sovereign immunity) and not the second certified question[5] (duty), I believe it has mixed the concepts of sovereign immunity and duty. This is understandable because Lamb had to discuss both concepts to determine whether the jury was properly instructed that a breach of duty by the state police could result in a violation of the defective highway statute. But I believe blending these distinct doctrines will thwart injured parties seeking to vindicate statutory rights in a way the legislature did not intend.
It is true that Lamb noted that the commissioner had "availed himself of the assistance of the state police" in maintaining the highways. Lamb v. Burns , supra, 202 Conn. at 171, 520 A.2d 190. In my view, however, that evidence was not necessary to the court's construction of the statute's sovereign immunity waiver. Rather, recalling that the issue on appeal in Lamb was whether the jury was properly instructed that "negligence on the part of the state police could provide a basis for finding the defendant liable under § 13a-144"; id., at 166, 520 A.2d 190 ; the court in Lamb concluded only that state police officers sometimes performed duties relating to highway maintenance, and that "neglect or default of the state police in safeguarding the hazardous ice condition ... provided a basis for the defendant's liability under § 13a-144." Id., at 171, 520 A.2d 190. Therefore, Lamb held, the trial court's jury instructions were not erroneous.
In the present case, the Appellate Court concluded that the statute's plain language waived the state's sovereign **440 immunity and further determined that (1) the state police owed the plaintiff a duty, and (2) there was a genuine issue of material fact as to whether the failure of the state police to close the bridge was unreasonable and a breach of that duty. Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 601-602, 148 A.3d 1147. To prove liability, the plaintiff would still have to establish at trial that the state police breached any duty owed to him.
In my view, the question of duty on the part of the state police is distinct from and not dispositive of the first certified question, which concerns the scope of the sovereign immunity waiver. Rather, the question of duty falls within the ambit of the second certified question, which the majority does not reach in favor of its sovereign immunity ruling. If indeed the state police had a duty to close the road in this case, I believe the plaintiff should have the opportunity *688 to prove a breach of that duty at trial.
Because I believe that the majority has mixed sovereign immunity (the first certified question) with the concepts of duty and breach (the second certified question), I do not feel compelled in this opinion to measure whether the evidence was sufficient in this case to demonstrate that the state police had a duty to close the bridge or breached that duty. It bears emphasis, however, that the Appellate Court noted that the record contains evidence that "the state police have the authority to close the road if they believe it is in the interest of public safety to do so." Id., at 602, 148 A.3d 1147. Also, the record contains evidence that the "[d]epartment relies on calls into its highway operations centers during off hours to advise it of road conditions," and that "off-hour calls ... come predominately from state and local police," who "are advised to call the operations center" when conditions require the department's response. In my **441 view, the plaintiff should be afforded the chance to develop this evidence at trial.
IV
The majority worries that if we construe the statute's waiver of sovereign immunity to include the factual scenario in this case, the "floodgates" will open and plaintiffs will bring claims about the neglect of all sorts of state employees, thereby subjecting the state to additional-and perhaps fanciful-lawsuits. I don't see it.
Although I suppose it is (and has been) true under Lamb that an allegation that the failure of a Department of Social Services employee, a correction officer or a judge(!) to take some action to close a highway could fall within the scope of the waiver of sovereign immunity ("neglect or default of the state or any of its employees"), I am hard-pressed to think of an instance in which such specious allegations could state a claim that might lead to liability. Again, in my view, the majority infuses the concept of duty into the question of the scope of a sovereign immunity waiver. In those clearly more attenuated situations the majority imagines, it is unlikely those state employees or officers would have any duty to keep the highway in repair. Although this might necessitate the commissioner's having to file a motion to strike based on lack of duty; see, e.g., Jarmie v. Troncale , 306 Conn. 578, 580, 50 A.3d 802 (2012) (affirming trial court's granting of motion to strike based on lack of duty); rather than a motion to dismiss based on sovereign immunity, that is only because of the legislature's exercise of its prerogative to enact a broad waiver of the state's sovereign immunity. Any (in my view, minimal) "interference with the performance of [the state's] functions"; (internal quotation marks omitted) Horton v. Meskill , 172 Conn. 615, 624, 376 A.2d 359 (1977) ; is a result of that broad waiver. Even Lamb itself, in construing the waiver as reaching state employees **442 beyond the department, limited that waiver to the negligence of only those employees "performing duties related to highway maintenance." Lamb v. Burns , supra, 202 Conn. at 169, 520 A.2d 190.
Moreover, as the commissioner admits candidly in his brief, the sovereign immunity question he advances is not about the state's ultimate fiscal liability: it is about deflecting responsibility for certain lawsuits to a different forum (i.e., the Claims Commissioner instead of the Superior Court) or to a different agency (i.e., the Department of Emergency Services and Public Protection instead of the Department of Transportation). As discussed in part V, I do not believe that the statute's plain language reflects an expressed concern by the legislature about which agency *689 would be named a defendant, but instead was intended to provide a forum for all motorists injured by the negligence of "the state or any of its employees ...." General Statutes § 13a-144.
V
Even when it comes to interpreting sovereign immunity waivers, which are narrowly construed, I do not "presume that the legislature intended [a] bizarre and potentially inequitable result." Lyon v. Jones , 291 Conn. 384, 404 n.10, 968 A.2d 416 (2009). Rather, I would credit the legislature with having understood when it used the broad phrase, "the neglect or default of the state or any of its employees," in § 13a-144, that state agencies other than the department, or employees other than those of the department, at times might bear responsibility for "performing duties related to highway maintenance"; Lamb v. Burns , supra, 202 Conn. at 169, 520 A.2d 190 ; and might act negligently in performing those duties, resulting in a defective highway, bridge or sidewalk.
Under the majority's reading of the statute, plaintiffs injured at times when employees within the department **443 are not working could be left without a remedy or might have to pursue a remedy in a different forum with a different statute of limitations if they are unable to establish a " Lamb type relationship" between the commissioner and the state employee.[6] Because the majority concludes that this showing is necessary to overcome the sovereign immunity bar, and because sovereign immunity implicates subject matter jurisdiction, if the commissioner contested such a relationship the plaintiff would have to establish the requisite facts at a "trial-like hearing" before litigation could proceed one step further.[7] Standard Tallow Corp. v. Jowdy , 190 Conn. 48, 56, 459 A.2d 503 (1983) ; see also Conboy v. State , 292 Conn. 642, 652-53, 974 A.2d 669 (2009) (same); Baldwin Piano & Organ Co. v. Blake , 186 Conn. 295, 297, 441 A.2d 183 (1982) ("[w]henever the absence of jurisdiction is brought to the notice of the court or tribunal, cognizance of it must be taken and the matter passed upon before it can move one further step in the cause" [internal quotation marks omitted] ), quoting Woodmont Assn. v. Milford , 85 Conn. 517, 524, 84 A. 307 (1912).
Motorists injured on our roads likely have no understanding of-and little interest in-which state agency **444 or employee should have taken action to abate a "highway defect." Extracting information about any relevant relationship between any negligent nondepartment employees and the commissioner is not likely to be immediately knowable, but might require protracted investigation or discovery. And this information is much more likely to be within *690 the ken of the state generally, and the department specifically. See, e.g., Arrowood Indemnity Co. v. King , 304 Conn. 179, 203, 39 A.3d 712 (2012) (placing burden on insurer instead of insured because insured was "party least well equipped to know, let alone demonstrate" facts at issue); Albert Mendel & Son, Inc. v. Krogh , 4 Conn. App. 117, 124 n.6, 492 A.2d 536 (1985) ("[i]t is said that the burden properly rests upon the party ... who has readier access to knowledge about the fact"). I find no evidence in the broad waiver of sovereign immunity contained in our defective highway statute that leads me to conclude that the legislature intended that those injured on state highways must engage in such sleuth work simply to meet a jurisdictional predicate.
Lamb involved an accident that occurred while the department was closed for the weekend. The present case involved a situation in which icy conditions arose before the department had opened for the day. Like the court in Lamb , therefore, I conclude, on the basis of the statute's plain language, that the legislature acted rationally to waive sovereign immunity as to claims of negligence by the state or any of its employees by means of any defective highway and directed the filing of one action naming the commissioner in his official capacity as a defendant. This avoids making injured parties bring different actions against different state actors in multiple forums, which advances neither the interests of the state nor its citizens and taxpayers.[8]
**445 VI
Finally, if Lamb holds as the majority concludes it holds, I would be tempted to vote to overrule Lamb as not consistent with the statute. Of course, principles of stare decisis and legislative acquiescence would counsel against that position.
*691 But in my view, Lamb held as the Appellate Court concluded, and as I have detailed previously: § 13a-144 unambiguously applies to the actions "of the state or any of its employees," regardless of their relationship to the commissioner. I believe that the legislature has acquiesced in that holding.
**446 I acknowledge it must seem strange to the reader that both the majority and dissent conclude that the legislature has acquiesced in Lamb 's interpretation of the waiver of sovereign immunity contained in our defective highway statute, but disagree on what that interpretation was. But in my view, the legislature's acquiescence is also informed by the way the executive branch has treated Lamb . Specifically, the commissioner in the present case-an executive branch official-has argued that Lamb was wrongly decided and should be overruled. Accordingly, this argument demonstrates the commissioner's own understanding that the Appellate Court's ruling was true to Lamb ; it signals that this is the interpretation the state has relied on.
More than thirty years have passed since this court decided Lamb , more than ample time for us to conclude that the legislature has acquiesced in Lamb 's holding. Indeed, if the legislature had any concerns about our conclusion in Lamb that the language "employed in § 13a-144 unambiguously support[s] the conclusion that the statute waives sovereign immunity for defective highway claims based upon the 'neglect or default' not merely of the commissioner of transportation, but 'of the state or any of its employees,' at least when performing duties related to highway maintenance"; Lamb v. Burns , supra, 202 Conn. at 169, 520 A.2d 190 ; it could have, in the intervening three decades, amended the statute to avoid this result. "Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) State v. Flemke , 315 Conn. 500, 512, 108 A.3d 1073 (2015).
Citizens injured by the neglect of the state's employees have come to rely on that holding and reasoning, and the state-through both the legislative and executive **447 branches-has certainly been able to plan for any litigation and liability contingencies our precedent might have exposed it to. See Conway v. Wilton , 238 Conn. 653, 658-59, 680 A.2d 242 (1996) (noting that stare decisis "is justified because it allows for predictability in the ordering of conduct [and] promotes the necessary perception that the law is relatively unchanging"). We are particularly reluctant to overrule our precedents when they involve questions of statutory interpretation on the ground that the legislature is free to alter the statute to correct what it believes is a misinterpretation. Florestal v. Government Employees Ins. Co. , 236 Conn. 299, 305, 673 A.2d 474 (1996). I believe this should be especially so when, as here, one of other the branches of government is involved in the litigation. The decision in Lamb represents this court's considered judicial determination of the legislature's intent. If the other branches believe we misconstrued or overestimated the breadth of the legislature's intended waiver, or simply wish to change the policy of the state, the legislature can act to amend the statute. It has not.
For these reasons, I respectfully disagree with the majority's conclusions and would, instead, affirm the Appellate Court's judgment.

General Statutes § 13a-144 provides in relevant part: "Any person injured in person or property through the neglect or default of the state or any of its employees by means of any defective highway, bridge or sidewalk which it is the duty of the Commissioner of Transportation to keep in repair, or by reason of the lack of any railing or fence on the side of such bridge or part of such road which may be raised above the adjoining ground so as to be unsafe for travel or, in case of the death of any person by reason of any such neglect or default, the executor or administrator of such person, may bring a civil action to recover damages sustained thereby against the commissioner in the Superior Court. No such action shall be brought except within two years from the date of such injury, nor unless notice of such injury and a general description of the same and of the cause thereof and of the time and place of its occurrence has been given in writing within ninety days thereafter to the commissioner...."

We granted the commissioner's petition for certification to appeal, limited to the following issues: (1) "[w]hether the Appellate Court properly concluded that the waiver of sovereign immunity under ... § 13a-144 extends to a claim that the state police were negligent in failing to close the bridge before a [department] crew could arrive to address the condition"; and (2) "[w]hether the Appellate Court properly imposed a duty on the state to employ 'adequate interim measures,' in place of or in addition to the [commissioner's] duty to remedy a highway defect within a reasonable time under the circumstances after actual or constructive notice ...." Graham v. Commissioner of Transportation , 324 Conn. 907, 152 A.3d 1245 (2017).

"Subsequent to the trial court's ruling, the [commissioner] moved for reconsideration, which was denied by the court. The [commissioner] did not file an interlocutory appeal from the trial court's denial of his motion to dismiss." Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 577 n.4, 148 A.3d 1147.

"On October 14, 2015, the plaintiff filed a motion for articulation, asserting that he never conceded that fifty minutes was a reasonable response time. Two weeks later, the trial court, Cole-Chu, J. , issued a memorandum stating that regardless of any such concession, the court would have ruled the same way on the [commissioner's] motion based upon the evidence before it." Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 583 n.5, 148 A.3d 1147.

The commissioner also argued, as an alternative ground for affirmance, that "the trial court lacked subject matter jurisdiction over this action because the plaintiff's written notice of intent to sue failed to satisfy the requirements of § 13a-144... insofar as the statute required him to disclose the location of his accident and resulting injuries." Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 574, 148 A.3d 1147. The Appellate Court concluded that "the adequacy of [the plaintiff's] written notice of intent to sue to apprise the [commissioner] of the location of his accident and injuries cannot be decided on [the] record as a matter of law ...." Id., at 575, 148 A.3d 1147. This conclusion is not at issue in the present certified appeal.

The court also explained that § 13a-144 was unambiguous and noted that while an examination of its legislative history would be superfluous given this conclusion, there was no legislative history explaining the relevant language of the statute. Lamb v. Burns , supra, 202 Conn. at 170, 520 A.2d 190.

This court also noted that "[a] reasonable interpretation of § 13a-144... implies that the commissioner is not relieved of potential liability when he calls upon the assistance of a contractor or other person from outside his department to perform highway maintenance operations ." (Citations omitted; emphasis added.) Lamb v. Burns , supra, 202 Conn. at 171, 520 A.2d 190.

The dissent claims that § 13a-144"sweeps broadly, reaching allegations of neglect or default 'of the state or any of its employees.' " (Emphasis added.) Concluding that the statute waives sovereign immunity for the neglect or default of any state employee is problematic for two reasons. First, this interpretation renders meaningless the requirement that a plaintiff bringing an action under § 13a-144 must prove, by a preponderance of the evidence, that the commissioner "actually knew of the particular defect or ... should have known of that defect." Ormsby v. Frankel , supra, 255 Conn. at 675-76, 768 A.2d 441. Such a reading would impute to the commissioner the observations of possibly thousands of state employees who might drive past a defect. Second, this interpretation greatly expands the interpretation of § 13a-144 set forth by this court in Lamb , and particularly the court's explicit statement that § 13a-144 waives sovereign immunity for the neglect of the state or any of its employees "at least when performing duties related to highway maintenance ." (Emphasis added.) Lamb v. Burns , supra, 202 Conn. at 169, 520 A.2d 190. Finally, the dissent's reading of § 13a-144 is inconsistent with the well established principle under which we construe waivers of sovereign immunity strictly in favor of the state. See, e.g., Hicks v. State , supra, 297 Conn. at 801, 1 A.3d 39 ; Envirotest Systems Corp. v. Commissioner of Motor Vehicles , supra, 293 Conn. at 388, 978 A.2d 49.

If the legislature's use of the term "any" was read without regard to the relationship between a state employee and the commissioner, the actions of a corrections officer, Judicial Branch employee, social worker, or any other state employee could trigger liability under § 13a-144.

The dissent concedes that such an absurd result is possible, but contends that it is "hard-pressed to think of an instance in which such specious allegations could state a claim that might lead to liability." This approach to sovereign immunity is untenable because it ignores the purpose of the doctrine and would require the state to litigate every case in which any state employee failed to report a highway defect. See Chadha v. Charlotte Hungerford Hospital , 272 Conn. 776, 786, 865 A.2d 1163 (2005) (sovereign immunity "protects against suit as well as liability-in effect, against having to litigate at all" [internal quotation marks omitted] ). The dissent's interpretation of § 13a-144 would defeat that aspect of sovereign immunity that protects the state from suit except in the narrow instances carved out by the legislature. As we have explained, "[t]he practical and logical basis of [sovereign immunity is] that the subjection of the state ... to private litigation might constitute a serious interference with the performance of [its ] functions ...." (Emphasis added; internal quotation marks omitted.) Horton v. Meskill , supra, 172 Conn. at 624, 376 A.2d 359. It is not merely liability that sovereign immunity seeks to address but, equally as important, the subjection of the state to litigation.
To this end, we disagree with the dissent's description of our analysis as it concerns these "specious" or "more attenuated" allegations as having improperly "mixed sovereign immunity (the first certified question) with the concepts of duty and breach (the second certified question)." We agree with the dissent that duty and sovereign immunity are doctrinally separate concepts, even though the proof necessary for a plaintiff to establish breach of duty and entitlement to the waiver of sovereign immunity may well overlap. See Coleman v. East Joliet Fire Protection District , 399 Ill.Dec. 422, 46 N.E.3d 741, 753 (Ill. 2016) (noting that "the issue of a duty is separate from the issue of immunity from liability based on that duty" and that immunity "does not occur from a denial of the tort's existence, but rather because the existing liability in tort is disallowed"). Put differently, we do not foreclose the possibility that a state employee whose agency has the relationship with the commissioner required for a waiver of sovereign immunity under Lamb nevertheless might lack a duty to act under a particular set of facts, or might not have breached such a duty, thus precluding the plaintiff from proving liability in that case.

A plaintiff may establish Lamb 's requisite relationship by presenting evidence that demonstrates that a formal procedure exists in which the commissioner has delegated his duty to remedy highway defects to the negligent state employee. For example, evidence that the state police had a formal directive from the commissioner to report highway defects and that the state police had assumed that duty.

We acknowledge that there are factual similarities between Lamb and this case. For example, like Lamb , the present case involves an off-hours call about an icy road condition. See Lamb v. Burns , supra, 202 Conn. at 160, 520 A.2d 190. Moreover, in both cases the state police responded to the scene, and the central issue was the reasonableness of their response. See id. As we have discussed, however, central to Lamb 's conclusion that the actions of the state police could subject the commissioner to liability under § 13a-144 was that the plaintiff had established that, by custom, the state police had a "duty" and "usual procedure" of reporting highway defects. (Internal quotation marks omitted.) Id., at 171, 520 A.2d 190. The evidence in the present case is insufficient to establish a genuine issue of material fact as to such a relationship.

Given our conclusion that, because there is no evidence establishing a Lamb type relationship between the state police and the commissioner, the commissioner is not liable for the actions of the state police, we need not reach the second certified question. See footnote 2 of this opinion.

The dissent states its concern about the potential need for a trial type hearing and "protracted investigation or discovery" with respect to the proof of the requisite relationship given that "[m]otorists injured on our roads likely have no understanding of-and little interest in-which state agency or employee should have taken action to abate a 'highway defect,' " and that "this information is much more likely to be within the ken of the state generally, and the department specifically." The dissent further finds "no evidence in the broad waiver of sovereign immunity contained in our defective highway statute that ... the legislature intended that those injured on state highways must engage in such sleuth work simply to meet a jurisdictional predicate." The dissent has not, however, provided any textual-or even extratextual-evidence to demonstrate that the legislature viewed proof of entitlement to the waiver of sovereign immunity under § 13a-144 as different from any other evidence to be obtained through routine jurisdictional discovery. Similarly, the dissent has failed to demonstrate that the "meaningful" opportunity to conduct discovery about jurisdictional matters that is required by Standard Tallow Corp. v. Jowdy , 190 Conn. 48, 56-57, 459 A.2d 503 (1983) ; see Lake Road Trust Ltd. v. ABB Powertech (Pty) Ltd. , 136 Conn. App. 671, 681-82, 51 A.3d 1109 (2012) ; see also Practice Book § 13-2 ; the various rights afforded under the Freedom of Information Act; see General Statutes § 1-200 et seq. ; and the availability of evidentiary hearings to resolve any disputed issues of fact; see, e.g., Machado v. Taylor , 326 Conn. 396, 399-400, 163 A.3d 558 (2017) ; are unsuitable to facilitate jurisdictional inquiries under the highway defect statute. This is particularly true in light of the trial court's discretion to "postpone" such a determination until after trial if those disputed "jurisdictional facts are intertwined with the merits of the case"; Conboy v. State , 292 Conn. 642, 653 and n.16, 974 A.2d 669 (2009) ; which often occurs in sovereign immunity cases. See footnote 10 of this opinion.

See footnote 2 of the majority opinion.

Specifically, the Appellate Court reversed the trial court's grant of summary judgment in favor of the defendant, the Commissioner of Transportation, holding that there is a genuine issue of material fact as to whether the department acted unreasonably in responding to notice of the icing condition, including whether it failed to make adequate use of available temporary remedies, such as electronic signs, while the icy condition was being remedied. Graham v. Commissioner of Transportation , supra, 168 Conn. App. at 599-603, 148 A.3d 1147. Thus, irrespective of today's holding in this certified appeal, there will be a trial on those issues. Id., at 603, 148 A.3d 1147.

Although our decision in Lamb preceded the legislature's passage of § 1-2z in 2003, it is useful to consider the plain language of § 13a-144 because Lamb held the language to be "unambiguous"; see Lamb v. Burns , supra, 202 Conn. at 169, 520 A.2d 190 ; and because we have held that the legislature did not intend by the passage of § 1-2z to upset any of this court's previous interpretations of statutes. See Hummel v. Marten Transport, Ltd. , 282 Conn. 477, 501, 923 A.2d 657 (2007).

General Statutes § 13a-144 provides: "Any person injured in person or property through the neglect or default of the state or any of its employees by means of any defective highway, bridge or sidewalk which it is the duty of the Commissioner of Transportation to keep in repair, or by reason of the lack of any railing or fence on the side of such bridge or part of such road which may be raised above the adjoining ground so as to be unsafe for travel or, in case of the death of any person by reason of any such neglect or default, the executor or administrator of such person, may bring a civil action to recover damages sustained thereby against the commissioner in the Superior Court. No such action shall be brought except within two years from the date of such injury, nor unless notice of such injury and a general description of the same and of the cause thereof and of the time and place of its occurrence has been given in writing within ninety days thereafter to the commissioner. Such action shall be tried to the court or jury, and such portion of the amount of the judgment rendered therein as exceeds any amount paid to the plaintiff prior thereto under insurance liability policies held by the state shall, upon the filing with the Comptroller of a certified copy of such judgment, be paid by the state out of the appropriation for the commissioner for repair of highways; but no costs or judgment fee in any such action shall be taxed against the defendant. This section shall not be construed so as to relieve any contractor or other person, through whose neglect or default any such injury may have occurred, from liability to the state; and, upon payment by the Comptroller of any judgment rendered under the provisions of this section, the state shall be subrogated to the rights of such injured person to recover from any such contractor or other person an amount equal to the judgment it has so paid. The commissioner, with the approval of the Attorney General and the consent of the court before which any such action is pending, may make an offer of judgment in settlement of any such claim. The commissioner and the state shall not be liable in damages for injury to person or property when such injury occurred on any highway or part thereof abandoned by the state or on any portion of a highway not a state highway but connecting with or crossing a state highway, which portion is not within the traveled portion of such state highway. The requirement of notice specified in this section shall be deemed complied with if an action is commenced, by a writ and complaint setting forth the injury and a general description of the same and of the cause thereof and of the time and place of its occurrence, within the time limited for the giving of such notice."

See footnote 2 of the majority opinion.

For example, under the majority's interpretation of the statute and Lamb , if the state police indeed had a duty to close the bridge, the plaintiff, rather than being able to bring an action under the defective highway statute's sovereign immunity waiver, would have to present a "claim" to the Claims Commissioner alleging negligence on the part of the state police. See General Statutes § 4-141 et seq. Rather than having the benefit of the two year statute of limitations under § 13a-144, the plaintiff would face a one year statute of limitations with the Claims Commissioner. See General Statutes § 4-148.

Exactly what a plaintiff would have to establish at this hearing is not clear. The statute offers no guidance and the majority offers only that a plaintiff can establish this relationship by providing evidence of "custom," "usual procedure," "formal procedure," whether the commissioner "availed" himself of the police, and whether the police had "assumed" the duty. Whether these factors are exhaustive or are mandatory predicates is not clear, nor to what extent a plaintiff can rely on traditional tort law principles and case law regarding duty.

Both the commissioner and the majority rely on language from our decision in White v. Burns , 213 Conn. 307, 567 A.2d 1195 (1990), that reads: "[T]he terms 'neglect' and 'default' refer solely to that action or failure to act by the commissioner which triggers liability for breach of his statutory duty to repair and maintain the state highway." (Emphasis added.) Id., at 323, 567 A.2d 1195. White goes on to say that "[t]he commissioner ... is the only one upon whom is imposed the duty to repair under § 13a-144." (Emphasis altered.) Id., at 326, 567 A.2d 1195. The majority concludes from these two quotations: "In other words, under § 13a-144, the commissioner alone is responsible for the maintenance of the state's highways and, accordingly, he alone is liable for a breach of that duty."
I do not agree with the conclusion the majority draws from this language. First, the only neglect or default at issue in White was the commissioner's; the court did not have to address the neglect or default of other state agencies or employees, as was at issue in Lamb . Thus, White in no way considers the broader language, "the state or any of its employees," while considering the commissioner's duties and, of course, does not in any way suggest that it overruled Lamb . Second, White was only about "sole proximate cause" and not about the scope of the legislature's waiver of sovereign immunity. White v. Burns , supra, 213 Conn. at 327, 567 A.2d 1195.
Finally, this syllogism does not work. It might be true that the commissioner has a duty to repair and maintain the state's highways; and he alone may have a duty to repair the state's highways. But that does not mean he alone has "duties related to highway maintenance." Lamb v. Burns , supra, 202 Conn. at 169, 520 A.2d 190. Construing the phrase from Lamb , "at least when performing duties related to highway maintenance"; id. ; the majority assumes that "at least" imposes a minimum condition. But the phrase can also mean "if nothing else" or "in any case." The former means that the condition is necessary while the latter means that it is merely sufficient. I read Lamb to contemplate the latter because we know from that case that at certain times, department officials or employees are not available, and others may be responsible for "duties related to highway maintenance" to make our roads safe for motorists. Lamb v. Burns , supra, at 169, 520 A.2d 190.